NATIONAL LABOR RELATIONS BOARD *v.* TRUCK
DRIVERS LOCAL UNION NO. 449, INTERNA-
TIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, A. F. L.

No. 103.   Argued January 17, 22, 1957.—Decided April 1, 1957.

*Dominick L. Manoli* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Theophil C. Kammholz* and *Stephen Leonard.*

*Thomas P. McMahon* argued the cause and filed a brief for respondent.

Briefs of *amici curiae* urging reversal were filed by *Peter T. Beardsley* and *Helen F. Humphrey* for the American Trucking Associations, Inc., and *Kenneth C. Royall* and *Frank C. Fisher* for the Linen & Credit Exchange et al.

Briefs of *amici curiae* supporting petitioner were filed by *George O. Bahrs, J. Paul St. Sure, Robert Littler* and *J. Hart Clinton* for the Bay Area Council of Bakery Operators et al., and *Gerard D. Reilly* for the Union Employers Section, Printing Industry of America, Inc.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question presented by this case is whether the non-struck members of a multi-employer bargaining association committed an unfair labor practice when, during contract negotiations, they temporarily locked out their employees as a defense to a union strike against one of their members which imperiled the employers' common interest in bargaining on a group basis.

The National Labor Relations Board determined that resort to the temporary lockout was not an unfair labor practice in the circumstances.[1]   The Court of Appeals for the Second Circuit reversed.[2]   This Court granted certiorari [3] to consider this important question of the construction of the amended National Labor Relations Act,[4] and also to consider an alleged conflict with decisions of Courts of Appeals of other circuits.[5]

Eight employers in the linen supply business in and around Buffalo, New York, comprise the membership of the Linen and Credit Exchange.   For approximately 13 years, the Exchange and the respondent Union, representing the truck drivers employed by the members, bargained on a multi-employer basis and negotiated successive collective bargaining agreements signed by the Union and by the eight employers.   Sixty days before such an agreement was to expire on April 30, 1953, the

---

[1] 109 N. L. R. B. 447.

[2] 231 F. 2d 110.

[3] 352 U. S. 818.

[4] 61 Stat. 136, 29 U. S. C. § 141 *et seq.*

[5] *Labor Board* v. *Continental Baking Co.,* 221 F. 2d 427 (C. A. 8th Cir.) ; *Labor Board* v. *Spalding Avery Lumber Co.,* 220 F. 2d 673 (C. A. 8th Cir.) ; *Leonard* v. *Labor Board,* 197 F. 2d 435, 205 F. 2d 355 (C. A. 9th Cir.) ; *Morand Bros. Beverage Co.* v. *Labor Board,* 190 F. 2d 576 (C. A. 7th Cir.).

Union gave notice of its desire to open negotiations for changes.[6]

The Exchange and the Union began negotiations some time before April 30, but the negotiations carried past that date and were continuing on May 26, 1953, when the Union put into effect a "whipsawing" plan [7] by striking and picketing the plant of one of the Exchange members, Frontier Linen Supply, Inc. The next day, May 27, the remaining seven Exchange members laid off their truck drivers after notifying the Union that the layoff action was taken because of the Frontier strike, advising the Union that the laid-off drivers would be recalled if the Union withdrew its picket line and ended the strike. Negotiations continued without interruption, however, until a week later when agreement was reached upon a new contract which the Exchange members and the Union approved and signed. Thereupon the Frontier strike was ended, the laid-off drivers were recalled, and normal operations were resumed at the plants of all Exchange members.

The Union filed with the National Labor Relations Board an unfair labor practice charge against the seven employers, alleging that the temporary lockout interfered with its rights guaranteed by § 7, thereby violating §§ 8 (a)(1) and (3) of the Act.[8] A complaint issued, and, after hearing, a trial examiner found the employers guilty of the unfair labor practice charged. The Board overruled the trial examiner, finding that "the more

---

[6] The contract contained an automatic renewal clause requiring notice of a desire to change the contract to be given 60 days before the expiration date. The notice was also in conformity with § 8 (d) of the Act. 61 Stat. 140, 29 U. S. C. § 158.

[7] "Whipsawing" is the process of striking one at a time the employer members of a multi-employer association.

[8] Section 7 provides in pertinent part:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted

reasonable inference is that, although not specifically announced by the Union, the strike against the one employer necessarily carried with it an implicit threat of future strike action against any or all of the other members of the Association," with the "calculated purpose" of causing "successive and individual employer capitulations." [9] The Board therefore found that "in the absence of any independent evidence of antiunion motivation, . . . the Respondent's [*sic*] action in shutting their plants until termination of the strike at Frontier was defensive and privileged in nature, rather than retaliatory and unlawful." [10] The Board, citing *Leonard* v. *Labor Board*, 205 F. 2d 355, concluded "that a strike by employees against one employer-member of a multiemployer bargaining unit constitutes a threat of strike action against the other employers, which threat, *per se*, constitutes the type of economic or operative problem at the plants of the nonstruck employers which legally justifies their resort to a temporary lockout of employees." [11]

---

activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 61 Stat. 140, 29 U. S. C. § 157.

Section 8 provides in pertinent part:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

.      .      .      .      .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 61 Stat. 140, 29 U. S. C. § 158.

[9] 109 N. L. R. B., at 448.

[10] 109 N. L. R. B., at 448. The Board relied upon the decision of the Court of Appeals for the Ninth Circuit in *Leonard* v. *Labor Board*, 205 F. 2d 355, 357–358, wherein the court stated: ". . . the right of the employers to lock out temporarily all the employees is no more than equal to the right of the union of all the employees to call out the employees of one after another of the . . . [employers] in the whipsawing manner . . . ."

[11] 109 N. L. R. B., at 448–449.

The Court of Appeals agreed "that the Board reasonably inferred" a threat of strike action against the seven employers because there were "no peculiar facts concerning the Union's relations with that single member." [12] The Court of Appeals thus implicitly found that the only reason for the strike against Frontier was the refusal of the Exchange to meet the Union's demands. But the court held that a temporary lockout of employees on a "mere threat of, or in anticipation of, a strike" [13] could be justified only if there were unusual economic hardship, and because "the stipulated facts show no economic justification for the lockout, . . . the lockout of non-striking employees constituted an interference with their statutory right to engage in concerted activity in violation of § 8 (a)(1) of the Act, and also constituted discrimination in the hire and tenure of employment of the employees because of the Union's action, thereby discouraging membership in the Union in violation of § 8 (a)(3) of the Act." [14]

Although, as the Court of Appeals correctly noted, there is no express provision in the law either prohibiting or authorizing the lockout, the Act does not make the lockout unlawful *per se.* Legislative history of the Wagner Act, 49 Stat. 449, indicates that there was no intent to prohibit strikes or lockouts as such. [15] The unqualified use of the term "lock-out" in several sections of the Taft-Hartley Act [16] is statutory recognition that there are circumstances

---

[12] 231 F. 2d, at 112.

[13] *Id.,* at 113.

[14] *Id.,* at 118.

[15] See, *e. g.,* explanation of the bill by Senator Walsh, Chairman of the Senate Committee on Education and Labor, 79 Cong. Rec. 7673.

[16] 61 Stat. 140, 29 U. S. C. § 158 (d)(4) (no resort to "strike or lock-out" during 60-day notice period); 61 Stat. 153, 29 U. S. C. § 173 (c) (Director of Mediation Service to seek to induce parties to settle dispute peacefully "without resort to strike, lock-out, or other

in which employers may lawfully resort to the lockout as an economic weapon. This conclusion is supported by the legislative history of the Act.[17]

We are not concerned here with the cases in which the lockout has been held unlawful because designed to frustrate organizational efforts, to destroy or undermine bargaining representation, or to evade the duty to bargain.[18] Nor are we called upon to define the limits of the legitimate use of the lockout.[19] The narrow question to be decided is whether a temporary lockout may lawfully be used as a defense to a union strike tactic which threatens the destruction of the employers' interest in bargaining on a group basis.

The Court of Appeals rejected the preservation of the integrity of the multi-employer bargaining unit as a justification for an employer lockout.[20] The court founded this conclusion upon its interpretation of the Taft-Hartley Act and its legislative history. After stating that "[m]ulti-employer bargaining has never received the express sanction of Congress," the court reasoned that

coercion"); 61 Stat. 155, 29 U. S. C. § 176 (appointment of board of inquiry by President when "threatened or actual strike or lock-out" creates a national emergency); 61 Stat. 155, 29 U. S. C. § 178 (power to enjoin "strike or lock-out" in case of national emergency).

[17] H. R. Rep. No. 245, 80th Cong., 1st Sess. 21–22, 70, 82; S. Rep. No. 105, 80th Cong., 1st Sess. 24; S. Rep. No. 105, Pt. 2, 80th Cong., 1st Sess. 21; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 34–35. See also, e. g., 93 Cong. Rec. 1827–1828, 3835.

[18] E. g., Labor Board v. Wallick, 198 F. 2d 477; Labor Board v. Somerset Classics, 193 F. 2d 613; Olin Industries v. Labor Board, 191 F. 2d 613; cf. Associated Press v. Labor Board, 301 U. S. 103.

[19] We thus find it unnecessary to pass upon the question whether, as a general proposition, the employer lockout is the corollary of the employees' statutory right to strike.

[20] As previously noted, the Board decision is based in part on a finding that the preservation of employer solidarity justifies a lockout as a defense to a whipsaw strike.

because at the time of the enactment of the Taft-Hartley Act the Board had never "gone to the extreme lengths to which it now seeks to go in order to maintain the 'stability of the employer unit,' " Congress cannot be said to have given legislative approval to the present Board action.[21] The court concluded that "Congress must have intended that such a radical innovation be left open for consideration by the joint committee it set up under § 402 of the Act to study, among other things, 'the methods and procedures for best carrying out the collective-bargaining processes, with special attention to the effects of industry-wide or regional bargaining upon the national economy.' "[22]

We cannot subscribe to this interpretation. Multi-employer bargaining long antedated the Wagner Act, both in industries like the garment industry, characterized by numerous employers of small work forces, and in industries like longshoring and building construction, where workers change employers from day to day or week to week. This basis of bargaining has had its greatest expansion since enactment of the Wagner Act because employers have sought through group bargaining to

---

[21] 231 F. 2d, at 117–118.

[22] *Id.*, at 118.

The opinion of the Court of Appeals may be interpreted as rejecting employer solidarity as a justification for a lockout on the ground that the Union strike constituted a withdrawal by the Union from the multi-employer bargaining unit. The Court of Appeals vigorously argued that a union should be accorded the same freedom of voluntary withdrawal from a multi-employer bargaining unit as the Board has accorded to individual employers. But that question is not presented by this case, and we expressly reserve decision until it is properly before us. The facts here clearly show that the Union strike was not an attempt to withdraw from the multi-employer bargaining unit. On the contrary, the Union continued to carry on negotiations with the Exchange until an agreement was reached and signed.

match increased union strength.[23] °Approximately four million employees are now governed by collective bargaining agreements signed by unions with thousands of employer associations.[24]   At the time of the debates on the Taft-Hartley amendments, proposals were made to limit or outlaw multi-employer bargaining.   These proposals failed of enactment.   They were met with a storm of protest that their adoption would tend to weaken and not strengthen the process of collective bargaining and would conflict with the national labor policy of promoting industrial peace through effective collective bargaining.[25]

The debates over the proposals demonstrate that Congress refused to interfere with such bargaining because there was cogent evidence that in many industries the multi-employer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining. The inaction of Congress with respect to multi-employer

---

[23] Bahrs, The San Francisco Employers' Council; Chamberlain, Collective Bargaining, 178–179, 180, 182; Freidin, The Taft-Hartley Act and Multi-Employer Bargaining, 4–5; Garrett and Tripp, Management Problems Implicit In Multi-Employer Bargaining, 2–3; Kerr and Randall, Collective Bargaining in the Pacific Coast Pulp and Paper Industry, 3–4; Pierson, Multi-Employer Bargaining, 35–36; Wolman, Industry-Wide Bargaining.

[24] 79 Monthly Labor Review 805 (1956).

Based on collective bargaining agreements on file with the Bureau of Labor Statistics in 1951, approximately 80% of the unionized employees in the laundry industry were represented under multi-employer bargaining.   B. L. S. Rep. No. 1 (1953), Collective Bargaining Structures: The Employer Bargaining Unit, 10.

[25] Hearings before Senate Committee on Labor and Public Welfare on S. 55 et al., 80th Cong., 1st Sess. 427–428, 1012–1017, 1032–1037, 1055–1057, 1162–1165, 2018–2019, 2370–2371; S. Rep. No. 105, pt. 2, 80th Cong., 1st Sess. 6–8; Hearings before House Committee on Education and Labor on H. R. 8 et al., 80th Cong., 1st Sess. 552–553, 1552–1554, 3024–3026; 93 Cong. Rec. 1834–1844, 4030–4031, 4443–4444, 4581–4587, 4674–4676.

bargaining cannot be said to indicate an intention to leave the resolution of this problem to future legislation. Rather, the compelling conclusion is that Congress intended "that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future." [26]

Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interests of employees and employers collide.[27] Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the competitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.[28]

---

[26] 231 F. 2d, at 121 (dissenting opinion).

[27] *Labor Board* v. *Mackay Radio & Telegraph Co.*, 304 U. S. 333; *Labor Board* v. *Continental Baking Co.*, 221 F. 2d 427; *Labor Board* v. *Spalding Avery Lumber Co.*, 220 F. 2d 673; *Leonard* v. *Labor Board*, 197 F. 2d 435, 205 F. 2d 355; *Morand Bros. Beverage Co.* v. *Labor Board*, 190 F. 2d 576; *Betts Cadillac Olds, Inc.*, 96 N. L. R. B. 268; *International Shoe Co.*, 93 N. L. R. B. 907; *Duluth Bottling Association*, 48 N. L. R. B. 1335.

[28] *Labor Board* v. *Babcock & Wilcox Co.*, 351 U. S. 105; *Republic Aviation Corp.* v. *Labor Board*, 324 U. S. 793; *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177.

In *Phelps Dodge,* the Court said:

". . . There is an area plainly covered by the language of the Act and an area no less plainly without it. But in the nature of things

The Court of Appeals recognized that the National Labor Relations Board has legitimately balanced conflicting interests by permitting lockouts where economic hardship was shown.[29]   The court erred, however, in too narrowly confining the exercise of Board discretion to the cases of economic hardship.   We hold that in the circumstances of this case the Board correctly balanced the conflicting interests in deciding that a temporary lockout to preserve the multi-employer bargaining basis from the disintegration threatened by the Union's strike action was lawful.

*Reversed.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

---

Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act.   Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations.   Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review.   Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.   On the other hand, the power with which Congress invested the Board implies responsibility—the responsibility of exercising its judgment in employing the statutory powers." 313 U. S., at 194.

[29] *Betts Cadillac Olds, Inc.,* 96 N. L. R. B. 268; *International Shoe Co.,* 93 N. L. R. B. 907; *Duluth Bottling Association,* 48 N. L. R. B. 1335.