**DETROIT NEWSPAPER PUBLISHERS ASSOCIATION, The Evening News Association, Owner and Publisher of the Detroit News, Knight Newspapers, Inc., Owner and Publisher of The Detroit Free Press, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NEWSPAPER DRIVERS & HANDLERS' LOCAL UNION NO. 372, INTERNATIONAL BROTHERHOOD of TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, IND., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 15722, 15743.**

United States Court of Appeals
Sixth Circuit.

June 3, 1965.

528

Daniel J. Tindall, Jr., Lawrence M. Kelly, Dickinson, Wright, McKean & Cudlip, Detroit, Mich., for Detroit Newspaper Publishers.

Clifford W. Van Blarcom, Philip T. Van Zile, Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., for Evening News Assn.

Kenneth Murray, Detroit, Mich., for Knight Newspapers.

David Leo Uelmen, Goldberg, Previant & Uelmen, Milwaukee, Wis., for Newspaper Drivers & Handlers' etc.

Jules H. Gordon, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Elliott Moore, Attorneys, N. L. R. B., Washington, D. C., on brief, for National Labor Relations Board.

Before CECIL and O'SULLIVAN, Circuit Judges, and KENT, District Judge.

CECIL, Circuit Judge.

This cause is before the Court upon the petition of Detroit Newspaper Publishers Association, The Evening News Association, owner and publisher of the Detroit News, and Knight Newspapers, Inc., owner and publisher of the Detroit Free Press, to review and set aside an order of the National Labor Relations Board, hereinafter called the Board, issued on January 15, 1964. 145 NLRB 996. The Board seeks enforcement of the

order. Detroit Newspaper Publishers Association, Evening News Association and Knight Newspapers, Inc. will be referred to herein as the Association, the News and the Free Press, respectively.

The Board found the News, only, guilty of an unfair labor practice in violation of Section 8(a) (1) and (3) [1] of the National Labor Relations Act, hereinafter called the Act, (Section 158(a) (1) and (3), Title 29, U.S.C.) by laying off or "locking out" certain of its employees, from April 16 to 19, 1962. The usual order followed. The News was directed to cease and desist from discouraging membership in certain unions or any other labor organization "by locking out any of its employees in order to support another employer which is struck by employees represented in a labor organization with which it does not bargain jointly in a multiemployer unit," and "(i)n any like or related manner interfering with, restraining, or coercing its employees in the exercise of the right to self organization," etc. It was also directed to make whole its employees for lost time and post the usual notice.

The evidence relating to the question presented here is undisputed and may be stated as follows: The Association is a voluntary unincorporated association whose membership consists solely of the News and the Free Press. It was formed many years ago by the Detroit papers for the purpose of negotiating and administering labor contracts and handling the labor relations of its members. The News and the Free Press are the only large daily newspapers in Detroit. The News publishes in the afternoon of week days and on Sunday morning. The Free Press publishes daily in the morning, including Sunday.

In October, 1961, Newspaper Drivers & Handlers' Local Union No. 372, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Ind., hereinafter called the Teamsters, and the petitioner in case No. 15743 herein gave notice to the Free Press of its desire to revise its contract with the Free Press expiring November 15, 1961. The Free Press and the Teamsters held seventeen bargaining sessions between October 26, 1961, and March 20, 1962. On April 6th, the Teamsters presented a revised proposal to the Free Press and advised that strike action would be recommended on April 11th, if a satisfactory offer was not received by that date. About noon of April 11th, the Free Press gave the Teamsters its "last best offer" which was presented to and rejected by the Teamster members in the Free Press unit. The members voted to strike, a picket line was set up that afternoon, and the Free Press suspended publication.

In October, 1961, the Teamsters also gave notice to the News of its desire for a revision of its contract with that newspaper. Between October 27, 1961, and January 11, 1962, the Teamsters and the News held thirteen bargaining meetings. The parties met again on March 22nd and the Teamsters agreed to submit revised contract proposals. Revised proposals were not submitted to the News until April 12th, the day following the commencement of the strike at the Free Press.

On April 9th and 10th officials of the News met with officials of the Free Press to discuss what were common problems with the Teamsters. It was found that of about eighteen issues between the Free Press and the Teamsters, ten of them were of interest to the News. The

1. 29 U.S.C. § 158 "Unfair Labor Practices"

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: \* \* \*."

News urged the Free Press not to give in on three of them under any circumstances. The News agreed that if the Teamsters struck the Free Press over its refusal to accede to any of those three demands, it would support the Free Press and would not publish. The two papers further agreed that they would not inform the Union that a strike against one would be a strike against both, or what the position of the News would be in event of a strike at the Free Press.

It is conceded that the Free Press and the News do not bargain with the Teamsters jointly or as a multiemployer unit, as that term is traditionally used by the Board and the courts. The News ceased publication when the Teamsters struck the Free Press. It did not publish any papers under date line of April 12th, 13th or 14th. The employees reported for work on those days and were paid. On Sunday, April 15th, the News published a "double-mast head" edition called *The Detroit News—The Detroit Free Press*. "A Temporarily Combined Edition." Following this the News notified its employees not to report for work until further notice. The employees were out through April 19th.

On April 13th, James Hoffa, President of Teamsters International, asked Robert Butz, Secretary of the Association, to arrange a meeting on the Free Press contract. He also told Butz "that the News had better be present or on a stand-by basis at the meeting because the issues at the News would have to be settled or they'd be on strike also." Hoffa and the Teamster officials met with the Free Press on the afternoon of April 13th and the morning of the 14th. They met with the News on the afternoon of April 14th.

Subsequently, through the efforts of George Edwards, then Police Commissioner of Detroit, now a Judge of this Court, acting as mediator, the Free Press and the Teamsters reached an agreement. The News and the Teamsters agreed that issues not solved between them would be submitted to arbitration. The Teamsters ended its strike on April 19th and the News ended its lockout.

■ The Board's decision is to the effect that a lockout,[2] except in the case of multiemployer bargaining units or for the purpose of avoiding economic loss, is prima facie a violation of Sections 8(a) (1) and 8(a) (3) of the Act. On March 29, 1965, the Supreme Court handed down its opinion in American Ship Building Company v. National Labor Relations Board, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855. The opinion in this case is relevant to the case now before us. Counsel for the Board request us to remand the within case to the Board for further consideration in the light of *American Ship Building* case.

The Board had all the evidence before it concerning the layoff of the employees of the News, including the background of the newspaper situation in Detroit, the past records of the News and Free Press in dealing with unions, the findings of fact of the trial examiner and the arguments of counsel on the question at issue. The view now taken by the Supreme Court was argued to the Board and it chose not to follow it but to bottom its decision on its conclusion that any lockout, other than for the exceptions above mentioned, was illegal. This was consistent with the Board's former decisions. Neither side requested a remand and we see no reason why one should be made now. Furthermore, we are of the opinion that under the undisputed facts in this case a violation of Sections 8(a) (1) and 8(a) (3) could not be supported. The motion to remand is therefore denied.

While in *American Ship Building* there was an impasse in the negotiations between the employer and the union, we do not think the teaching of that case merely adds another exception to the Board's category of permissible lockouts.

2. A layoff of employees in connection with collective bargaining negotiations is commonly referred to as a "lockout."

■■ As was said in that case, to establish a violation of Section 8(a) (1),

"[I]t must be shown that the employer has interfered with, restrained, or coerced employees in the exercise of some right protected by § 7 of the Act. The Board's position is premised on the view that the lockout interferes with two of the rights guaranteed by § 7: the right to bargain collectively and the right to strike. In the Board's view, the use of the lockout 'punishes' employees for the presentation of and adherence to demands made by their bargaining representatives and so coerces them in the exercise of their right to bargain collectively. It is important to note that there is here no allegation that the employer used the lockout in the service of designs inimical to the process of collective bargaining. There was no evidence and no finding that the employer was hostile to his employees banding together for collective bargaining or that the lockout was designed to discipline them for doing so." 380 U.S. at 308, 85 S.Ct. at 962.

It is likewise true in the case before us "that there is no allegation that the employer used the lockout in the service of designs inimical to the process of collective bargaining." (Supra) There is no finding that the News was hostile to the Teamsters, or that it in any way attempted to interfere with the Teamsters' right to collective bargaining, or that the layoff was designed to discipline the employees for adhering to its union demands. Nor would the facts support such a finding. The News as well as the Free Press had a long record of dealing with the Teamsters. There was no disposition manifested to refuse to bargain with the Teamsters or to discourage membership in its union. Nor was there any animus shown toward the organization of the Teamsters or any of its members. The only question between the News and the Teamsters concerned the terms of the collective bargaining agreement.

With reference to a violation of Section 8(a) (3) the Court said:

"To find a violation of § 8(a) (3) then, the Board must find that the employer acted for a proscribed purpose. Indeed, the Board itself has always recognized that certain 'operative' or 'economic' purposes would justify a lockout. But the Board has erred in ruling that only these purposes will remove a lockout from the ambit of § 8(a) (3), for that section requires an intention to discourage union membership or otherwise discriminate against the union. There was not the slightest evidence and there was no finding, that the employer was actuated by a desire to discourage membership in the union as distinguished from a desire to affect the outcome of the particular negotiations in which he was involved." 380 U.S. at 313, 85 S.Ct. at 964.

What the Court said about the lack of evidence and findings is equally true in the case at bar. The Court concluded "that where the intention proven is merely to bring about a settlement of a labor dispute on favorable terms, no violation of § 8(a) (3) is shown." 380 U.S. at 313, 85 S.Ct. at 965.

In National Labor Relations Board v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839, the Court said:

"We begin with the proposition that the Act does not constitute the Board as an 'arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands.' National Labor Relations Board v. Insurance Agents [Intern Union], 361 U.S. 477, 497 [80 S.Ct. 419, 4 L.Ed.2d 454]. In the absence of proof of unlawful motivation, there are many economic weapons which an employer may use that either interfere in some measure with concerted employee activities, or which are in some degree discriminatory and discourage union membership, and yet the use of such economic weapons

does not constitute conduct that is within the prohibition of either §§ 8(a) (1) or (3)." 380 U.S. at 283, 85 S.Ct. at 984.

And further, at p. 286, 85 S.Ct. at p. 985, "Under that section (8(a) (3)) both discrimination and a resulting discouragement of union membership are necessary, but the added element of unlawful intent is also required."

In N. L. R. B. v. Truck Drivers Local Union No. 449, etc., 353 U.S. 87, at p. 92, 77 S.Ct. 643, at p. 645, 1 L.Ed.2d 676 (*Buffalo Linen*) the Court said:

"Although, as the Court of Appeals correctly noted, there is no express provision in the law either prohibiting or authorizing the lockout, the Act does not make the lockout unlawful *per se*. Legislative history of the Wagner Act, 49 Stat. 449, indicates that there was no intent to prohibit strikes or lockouts as such."

We conclude that the Board was in error in finding that the lockout of employees by the News was prima facie a violation of Sections 8(a) (1) and 8(a) (3). We further conclude that the violations of Sections 8(a) (1) and 8(a) (3), as found by the Board, are not supported by a consideration of the record as a whole. The order of the Board is therefore vacated and enforcement denied.

In appeal No. 15743, the Teamsters, as petitioner, challenge the Board's findings: 1. that the suspension of publication by the News from April 12 to April 14, 1962, did not constitute a threat to lock out employees in violation of Sections 8(a) (1) and 8(a) (3) of the Act; and 2. that the Free Press and the Association did not violate Sections 8(a) (1) and 8(a) (3) of the Act by implementing their agreement with the News. The petitioner concedes that its position can only be sustained in the event that the Court holds that the lockout by the News was a violation of the Act. Since we hold that this lockout was not in violation of the Act, the petition of the Teamsters is dismissed.