**PUBLISHERS' ASSOCIATION OF NEW YORK CITY, Hearst Consolidated Publications, Inc., Newspaper Enterprises, Inc., Long Island Daily Press Publishing Co., Inc., New York World Telegram Corp., News Syndicate Co., Inc., and The New York Times Company, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

New York Typographical Union No. 6, Intervenor.

No. 383, Docket 30222.

United States Court of Appeals Second Circuit.

Argued May 31, 1966.

Decided July 25, 1966.

---

---

John R. Schoemer, Jr., New York City (Townley, Updike, Carter & Rodgers, New York City, on the brief), for petitioners.

Solomon I. Hirsh, Atty., National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and George H. Cohen, Atty., National Labor Relations Board, on the brief), for respondent.

John J. Sheehan, New York City, for intervenor.

Before MOORE, SMITH and KAUFMAN, Circuit Judges.

SMITH, Circuit Judge:

The Publishers' Association of New York City and individual member publishers petition to review and set aside an order of the National Labor Rela-

tions Board, issued December 21, 1965, 156 NLRB No. 16, finding that each publisher, by refusing to bargain collectively with the Union as the duly elected representative of its composing room employees, was engaged in unfair labor practices in violation of Section 8(a) (5) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a) (5) and (1), and requiring each publisher to cease refusing to bargain with the intervenor union, the New York Typographical Union No. 6, and interfering in any like or related manner with the Union's efforts to bargain with each publisher individually, to bargain on request, and to post notices. The Board cross-petitions for enforcement. We hold the Board's ruling correct, deny the petition for review, and order enforcement.

The Association and Intervenor (as well as a variety of other unions, each on its own) have a long history of multiemployer bargaining, although at times individual publishers have deserted the Association under pressure, and have made separate contracts. A multiemployer contract was effective between the petitioners and the union for the year ending March 30, 1965. But on June 26, 1964, the union notified petitioners that it desired separate contracts with each publisher. On July 21, 1964, the Association rejected this request, and has refused to negotiate contracts except on a multiemployer basis.

The Board found that the union's notice of withdrawal was timely and unequivocal, that the individual employer units were appropriate units, and that each publisher violated § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158, by refusing to bargain. The union has a majority of the employees in each individual unit.

The Board's determination was in conformity with its decision in a substantially identical case, The Evening News Association, 154 NLRB No. 121 (1965). There, its holding was based largely on the proposition that a multiemployer unit is a purely consensual device which em-

ployers may freely leave as long as notice is timely and unequivocal. Compare NLRB v. Sheridan Creations, 357 F.2d 245 (2d Cir. 1966). "Mutual consent * * * is a basic ingredient necessary to support the appropriateness of a multi-employer unit." Andes Fruit Co., 124 NLRB 781, 783 (1959); see also Rayonier, Inc., 52 NLRB 1269 (1943); Great Atlantic & Pacific Tea Co., 145 NLRB 361, enforced in relevant part, 340 F.2d 690 (2d Cir. 1965). And the Board has not found inappropriate a unit where there was consent as evidenced by a history of multiemployer bargaining.

As for withdrawal, the Board has held that an employer may freely withdraw, subject only to the requirement that, unless there is mutual consent, notice of withdrawal must be timely and unequivocal. Retail Associates, Inc., 120 NLRB 388 (1958); Anderson Lithograph Co., 124 NLRB 920, 928–929 (1959), enforced sub nom. NLRB v. Jeffries Banknote Co., 281 F.2d 893 (9th Cir. 1960); Detroit Window Cleaners Union, 126 NLRB 65, 70–71 (1960), and cases cited; Milk & Ice Cream Dealers of Greater Cincinnati, 94 NLRB 23, 25 (1951); York Transfer & Storage Co., 107 NLRB 139. This rationale had not before this case and Evening News been extended by the Board to an instance of union withdrawal from a multiemployer unit. Cf., however, Retail Associates at 395; Truck Drivers Local Union No. 449, etc. (Buffalo Linen) v. NLRB, 231 F.2d 110, 115–116 (2d Cir. 1956), reversed 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). The Supreme Court there left the question open.

The Board's position has the advantage of simplicity and of apparent equality of treatment of parties on both sides of the table. It has had little consideration in the courts, although this court in Truck Drivers Local (Buffalo Linen) v. NLRB, supra, remarked that it would seem only fair that a union be accorded equal withdrawal privileges. As noted above, the Supreme Court expressly reserved the question, 353 U.S. 87, 94 n. 22, 77 S.Ct. 643. The arguments against the Board's position are forcefully stated by Member Brown dissenting in both Evening News Association and in this case.

Essentially, the Board held that since multiemployer bargaining may be initiated only on consent of the parties, it may be terminated by timely withdrawal of consent by either party. The only limitation would appear to be that the withdrawal must be genuine, that is, "unequivocal." Member Brown would hold that consent once given, and the multiemployer-union relationship once entered into, the Board has the power and duty to determine whether the aims of the Act are best served by allowing union withdrawal or forbidding it.

While the question is not wholly free from doubt, we conclude that the Board was correct in determining that the Congress did not intend to instruct it to require an unwilling union to continue in the consensual relationship if it unequivocally withdrew its consent. Denial of the right to withdraw might well discourage formation of multiemployer bargaining units for fear of being locked into a unit that might later prove antagonistic to the interests of the consenting party.

To be sure, the multiemployer bargaining unit sometimes has considerable advantages for both parties to the relationship, and particularly in fields where large numbers of small employers are typical it has been favored, and such bargaining units found appropriate. And withdrawal of a union from such a multiemployer unit relationship may have much more harmful effects on the continuing of this type of bargaining than withdrawal of one or more employers. This may, in a situation such as the New York newspaper field we have here, substantially tilt the balances on the side of the economic power of the union against the employers. But the Congress while encouraging bargaining has not attempted to destroy the economic weapons of either party to industrial labor disputes.

NLRB v. Insurance Agts. Int'l Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); NLRB v. Brown et al., 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). It has recognized and enforced the employees' right to self organization and collective bargaining, but left intact the right to use the economic weapons of strike and lockout when good faith bargaining fails, without authorizing the Board to put its thumb on the scales in the bargaining process.[1]

■ The employers fear the whipsaw strike if the bargaining must be between the individual units the Board has held appropriate and the union. We may doubt that this fear is entirely justified in view of the history of employers moving in and out of the unit here in the past, of the possibility of bargaining through the Association as designee of each employer in its individual bargaining, and of the as yet not fully explored mutual lockout possibilities even after forced dissolution of the bargaining unit.[2] In any case, requiring the Board to weigh and act on relative bargaining strength in the sense of the potential effectiveness of economic weapons available to each side, in determining appropriateness of bargaining units, would seem enough of a departure from the general scheme of the Act to call for explicit statutory provisions. This is especially so in view of the fierce debates over multiple bargaining during considerations of the Taft-Hartley amendments, and the lack of agreement thereon.[3]

Buffalo Linen suggests (353 U.S. 87, 96-97, 77 S.Ct. 643) that while the Board may, as we have held, permit withdrawal from multiemployer bargaining by certifying individual employer units, it still has a responsibility of determining the limits of the legitimate use of self-help by individual employers to meet their needs which might alternatively have been protected by multi-unit bargaining, and which they fail to obtain by good faith individual bargaining. No such question was before the Board in this proceeding, and we need not consider it here.

■ The other questions raised require little discussion. There is no substantial attack here on the Board's finding that single employer units are appropriate, except on the ground that the multiemployer unit is the more appropriate. It is sufficient to note that the parties agreed as to job classifications and that a plant or employer size unit is presumptively appropriate.

Finally, petitioners assert the impropriety of forcing them to face an unfair labor practice charge in order to test the appropriateness of the unit. We fail to see any distinction, however, in this respect between the situation here and the case of a new unit, and there the propriety of the procedure has long been

---

1. Studies were undertaken by a subcommittee of the House Committee on Education and Labor in the 88th Congress— see Committee print "Multiemployer Association Bargaining and Its Impact on the Collective Bargaining Process," Report of the General Subcommittee on Labor, Committee on Education and Labor, House of Representatives, 88th Congress, 2d Session.

The Committee collected many views on the general subject, and noted among other problems the question before the courts in this case and in Evening News. It did not reach the point of suggesting any specific legislation to the full committee, recommending instead further exploration of the subject. About all that can be drawn from the report is that the subcommittee at the time of the report was generally favorable to the continuation of multiemployer bargaining in principle.

2. Cf. Acme Markets, Inc., 156 NLRB No. 127, 61 LRRM 1281, and Weyerhauser Company, 155 NLRB No. 82, 60 LRRM 1425.

3. See Legislative History of the Labor Management Relations Act, 1947 (G.P.O. 1948), National Labor Relations Board v. Truck Drivers Local Union No. 449, etc. (Buffalo Linen), 353 U.S. 87, 95, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957).

recognized. NLRB v. Burroughs Corp., 261 F.2d 463 (2d Cir. 1958); Sheridan Creations, supra, 357 F.2d at 248.

The petition for review is denied. The order of the Board is ordered enforced.

KAUFMAN, Circuit Judge (concurring):

The strife between publishers and unions in New York is old, serious and discomforting to the citizens of this city. I fear, as did the dissenting member of the Board in this and Evening News Association, that our decision will not alleviate and might, perhaps, exacerbate the antagonisms which have been the antithesis of labor-management peace. Thus, the history of more than 50 years of multiemployer bargaining will be disrupted upon the whim of one of the parties without any reasons assigned and with more abrasiveness sure to follow as a result.

But, I agree with my brother Smith that the solution to any inequities which result from these actions must be supplied by Congress and not this Court. It has been settled law that the Board may not concern itself with the weight of economic weapons in determining an appropriate bargaining unit or in enforcing the collective bargaining provisions of the National Labor Relations Act. Labor-management disagreements ordinarily come to an end when the economic weapon becomes intolerable for either side—with the public ire playing its subtle part in accelerating the termination of a work stoppage. But, this weapon has been present and used in most labor disputes. If it is to be neutralized or minimized in the circumstances presented in this case, so that a consensual relationship once entered into will continue until the Board makes a determination that "the aims of the Act are best served by allowing union withdrawal or forbidding it," I believe Congress will first have to consider the problem and speak specifically on the subject.