Herbert W. BROWN et al.

v.

TRUCK DRIVERS AND HELPERS LOCAL UNION NO. 355 OF BALTIMORE, MARYLAND, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America

and

W. Kelly Gregory, Inc.

Civ. A. No. 17858.

United States District Court
D. Maryland.

Oct. 24, 1968.

See also D.C., 264 F.Supp. 776.

James J. Doherty, Friedman & Goodman, Baltimore, Md., for plaintiffs.

Jacob J. Edelman, Bernard W. Rubinstein, Baltimore, Md., for defendant Truck Drivers and Helpers, etc.

Edward J. Gutman, Jacob Blum, Baltimore, Md., for defendant W. Kelly Gregory, Inc.

NORTHROP, District Judge.

This suit is brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The plaintiffs, union members, charge that they are being deprived of legal rights due them under their collective-bargaining agreement by a deliberate conspiracy to misinterpret that agreement. The factual setting in this case for the most part is stipulated to by the parties (see Appendix). The court has heard testimony on behalf of the plaintiff, oral argument by all parties, and carefully considered memoranda submitted by counsel.

This dispute arose when the Southern Motor Transfer Corporation (Southern) went out of business. Southern was a trucking firm under contract to haul for the Great Atlantic & Pacific Tea Company (A&P).[1] At Southern's demise, another A & P contract carrier, W. Kelly Gregory, Inc. (Gregory) negotiated with the A&P to perform the Southern contract. At this juncture representatives of the Truck Drivers and Helpers Local Union No. 355 of Baltimore, Maryland (Union) began negotiations with Gregory for the transfer of the Southern employees to Gregory. Gregory was not at first disposed to take all of the former Southern employees, but after some negotiation agreed to transfer all of the former Southern employees to its rolls. Under this arrangement the former Southern employees were added to the bottom of the Gregory seniority list as to allocation-of-earning opportunities, but retained their Southern seniority among themselves. The transferred employees were given credit for their seniority at Southern in regard to vacation, pensions, and health and welfare benefits which, of course, did not in any way affect the Gregory employees' allocation-of-earning opportunities.

---

1. A trucking firm which was under contract with the A&P such as Southern would haul solely for the A&P. Truck-ing firms doing this type of hauling under contract to a food chain were commonly called "contract carriers".

Plaintiffs protested this action arguing that they were entitled to total credit for their Southern seniority and should be dovetailed with all of the other Gregory employees as to allocation of jobs. They met with Union representatives who, after discussing the problem with them and their attorney, agreed that the seniority problem should be presented under the existing procedure provided in the bylaws. Pursuant to those bylaws a committee was formed which met with the Executive Board on August 25, 1964, to discuss the problem. At the next meeting of the general membership in September of 1964 the membership was informed of the Committee-Executive Board discussion, and a motion was presented by Herbert W. Brown, one of the plaintiffs herein, calling for dovetailing of seniority in the event one company took over the operation of another. The motion lost. At the request of Brown, the committee and union representatives met again in October and discussed the problem. At that meeting Brown requested that a representative of the International Teamsters Union be present. In November of 1964 a meeting was held with John Greely, an official of the International, present. Prior to the discussion of the issue, Mr. Greely stated that he was familiar with the action of the local union and agreed with it. After hearing discussion on the issue, Mr. Greely stated that the action of the local would stand.[2] Plaintiffs thereupon instituted this class action.

The crux of the plaintiffs' claim is that the collective-bargaining agreement clearly and without any other possible interpretation is an agreement between the Union and all contract carriers who are hauling for the A&P.

To support this interpretation the plaintiffs point to past collective-bargaining agreements. The agreement for the period 1958–61 was between the Union and the Voluntary Association of Contract Carriers Serving the A&P Food Stores in the Baltimore Area (Association), a self-descriptive association. The last two bargaining agreements for the periods 1961–64 and 1964–67 have been between the Union and each individual company which has been designated as a participating member of the Association.[3] Plaintiff contends that the joint operation of these contract carriers is proven by the fact that the 1958–61 agreement designates the Association as the "Company".[4] Plaintiffs also claim that the designation of each individual company as "Company" in the 1961–64 and 1964–67 agreements is a subterfuge designed to hide the true nature of this operation.

Again plaintiffs insist that the true nature of the agreement is proven by reference to two prior similar problems. The plaintiffs first point to the dovetailing of Gregory employees with employees of Watson Brothers, Randolph J. Thomas, Robert Fertitta, and W. Kelly Gregory in 1959 when those companies were merged and reorganized to form W. Kelly Gregory, Inc., and second, to the assumption of former seniority status in earning opportunity of the employees of the former George W. Krill, Inc., when those employees returned to work for George O. Krill, Inc., a new company which was incorporated by the son of George W. Krill.

The Union and Gregory claim that earning opportunities, promotions and layoffs were single company rights, not to be carried from one food-hauler to another. In support of this position defendants rely on the actual terms of the 1964–67 and 1961–64 collective-bargaining agreements and the tenor of the 1958–61 agreement. Defendants admit the Gregory dovetailing in 1959, but assert (and this is stipulated) that this arrangement was a part of a merger and reorganization which was the subject of ICC approval and, thus, in no way

---

2. See Agreed Statement of Facts Nos. 13–24, especially Nos. 19, 21, 22, and 23.

3. Plaintiffs' exhibits B and C.

4. Plaintiffs' exhibit A and Agreed Statement of Facts No. 12.

related to any collective bargaining rights between the parties. The defendants claim that the handling of the Krill closing and subsequent reorganization is in support of the defendants' interpretation of the contract rather than the plaintiffs'.

The agreed facts are that George W. Krill, Inc., went out of business on October 3, 1959, and the employees of Krill were transferred to the bottom of the seniority lists of Southern and Gregory. However, the former Krill employees retained all Krill seniority with respect to health and welfare benefits, vacations, and pensions.[5] Subsequently, in 1961, the Krill family was able to organize a new company under the name of George O. Krill, Inc., and invited back all of the former employees with full seniority rights based on their seniority with the former Krill company.

The defendants claim this is entirely consistent with the present practice since there as here the transferred employees were at the bottom of the Gregory and Southern seniority lists retaining their Krill seniority for fringe benefits and among themselves. Thus, the defendants urge, when the new Krill company, George O. Krill, Inc., began operations, the former Krill employees who transferred to the new company retained their seniority among themselves. Finally the defendants point to the testimony of plaintiffs' witness Joseph Stamm who testified upon cross-examination that to his knowledge employees of the various contract carrier companies have never had the right to use their seniority with one company to obtain "earning opportunities" with another company.

■ In order to succeed in this action, the plaintiffs must prove that the defendants have arbitrarily and in bad faith so interpreted this contract as to cause a breach of the agreement and a breach of the Union's duty of fair representation. The principle that union action which is taken honestly and with

deliberation will not be disturbed by the courts is one of long standing. It was applied in Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1954), a case in which the union had agreed to an amendment permitting World War II veterans to accrue seniority time while serving overseas necessitating the laying off of some existing employees. The Court explained:

"Inevitably differences arise in * * the terms of any negotiated agreement * * *. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S., at 338, 73 S.Ct., at 686

Again in Humphrey v. Moore, 375 U.S. 335, 355, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), the Court upheld a union decision to seek and obtain complete dovetailing of employees of two competing automobile transporting companies which were reshaping their respective territories of operation. The Court expounded:

"[W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another." 375 U.S., at 349, 84 S.Ct., at 371

■ This principle was recently reaffirmed by the Supreme Court in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Reasoning from the general principle that a breach of the statutory duty of fair representation occurs only when the union's conduct is arbitrary and in bad faith, the Court held that a union could in good faith refuse to enforce union procedures to

---

5. See Agreed Statement of Facts No. 12.

arbitrate a grievance claim. It is clear that in the absence of evidence of unfairness or dishonesty union procedures and policies are not subject to judicial attack.

■ The background of this litigation presents a regrettable situation. When companies cease operation, hard decisions regarding the fate of all employees concerned must be made. It is generally inevitable that some must suffer hardship in spite of the best efforts of unions and companies. The plaintiffs contend that they should not have suffered these hardships because the collective-bargaining agreements between the parties gave them seniority rights among all companies hauling under an A&P contract interchangeably. Upon the facts as stipulated and as this court has found them to be, this court finds no merit in the contentions of the plaintiffs.

There is no evidence of joint operation from the bare fact that all of these trucking companies worked for the same company, i. e. all were under contract with the A&P food chain. Plaintiff witness Joseph Stamm affirms that the companies were single entities and seniority was not transferable from one to another. Indeed, in all instances when employees either individually or as a group went to work for a different company among these separate A&P truckers, their names were placed at the bottom of the list, in reference to earning opportunities, of those employees working for that company. In the light of this testimony and in the absence of any testimony or other evidence showing a joint operation between these companies, it is clear that each company is a separate single entity with sole managerial and financial responsibility within itself. It is true that these companies have group-bargained with the Union to gain negotiating strength. This practice is well within the law and is widespread.[6] The legal status of the companies is not changed by their joining a multi-employer association; nor are the legal rights of their employees enlarged or diminished by such an arrangement.

By its terms, the collective-bargaining agreement in force during this dispute calls for seniority to be determined between the employees of the individual companies. Neither this agreement nor any other past agreement between the parties makes any provision for the transfer of employees of a company which is going out of business. It is admitted that in an earlier similar situation involving the employees of George W. Krill, Inc., an identical procedure had been followed. It is clear that the Gregory merger was substantially different from the Krill and the present situation. Gregory involved several viable companies merging together and reorganizing into a corporate form. Moreover, since the purchase of an ICC permit was involved, the merger and reorganization required ICC approval. This court finds that when one of the trucking firms hauling under contract with the A&P was going out of business, the Union would attempt to negotiate with the other carriers who were taking over the defunct companies' contract for the transfer of the employees of the defunct company. These negotiations were not based upon the provisions of the collective-bargaining agreement which was silent as to this problem, but were based on mutual desire to resolve an unexpected development. The court further finds that the arrangement worked out between the Union and Gregory was negotiated in good faith and that the position of the Union was neither arbitrary nor collusive. The 1959 Gregory merger and reorganization, while a fair and reasonable arrangement, is not relevant to the instant situation. In view of the court's decision on the merits, this opinion need not discuss the problem of the plaintiff's damages.[7]

---

6. See NLRB v. Truck Drivers Local Union No. 449, 353 U.S. 87 at 94–96, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957).

7. Plaintiffs waived all damages claims, but sought to recover the legal fees of this suit. Legal fees are assessable against

Accordingly judgment will be entered for the defendants.

### APPENDIX [8]

### AGREED STATEMENT OF FACTS

1. The Court has jurisdiction under Section 301 of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 185.

2. At all times material herein Plaintiffs have been members in good standing of and represented by Defendant Truck Drivers and Helpers Local Union No. 355, Baltimore, Maryland ("Union"); until August 3, 1964 were employed by Southern Motor Transfer Corporation ("Southern") as truck drivers and/or helpers; and since August 3, 1964 have been employed by the Defendant, W. Kelly Gregory, Inc. ("W.K.G., Inc.") as truck drivers and/or helpers.

3. Plaintiffs' Exhibits A, B, and C, attached to their amended Bill of Complaint are correct copies of collective bargaining agreements covering all of the Plaintiffs in this proceeding, in effect between the employer of the said Plaintiffs and the Union. The said collective bargaining agreements covered the period beginning 12:01 A.M. August 1, 1958 and ending 12:01 A.M. August 1, 1967.

4. On December 12, 1958, the Defendant, W. Kelly Gregory, Inc. was incorporated under the laws of the State of Maryland for the purpose of acquiring the operating rights and physical assets of Frank Watson and John Watson, W. Kelly Gregory, Randolph J. Thomas, and Robert Fertitta.

5. At the time of the incorporation of W. Kelly Gregory, Inc., W. Kelly Gregory was a motor carrier operating under authority of a permit issued by the Interstate Commerce Commission of the United States and was a party to the 1958–1961 collective bargaining agreement (Exhibit A). At the time of the incorporation of W. Kelly Gregory, Inc., Frank Watson and John Watson were partners, trading as Watson Brothers and were operating as a motor contract carrier under authority of a permit issued by the Interstate Commerce Commission of the United States and were covered by the 1958–1961 collective bargaining agreement (Exhibit A). At the time of the incorporation of W. Kelly Gregory, Inc., Randolph J. Thomas was a contract carrier by motor vehicle operating under authority of a permit issued by the Interstate Commerce Commission of the United States and was covered by the 1958–1961 collective bargaining agreement (Exhibit A). At the time of the incorporation of W. Kelly Gregory, Inc., Robert Fertitta was a contract carrier by motor vehicle operating under authority of a permit issued by the Interstate Commerce Commission of the United States and was covered by the 1958–1961 collective bargaining agreement (Exhibit A).

6. On December 29, 1958 W.K.G., Inc., a Defendant, entered into an agreement to purchase the operating rights and physical property of Frank Watson and John Watson, partners, trading as Watson Brothers. On March 28, 1959 W.K.G., Inc., a Defendant, agreed to purchase the operating rights and physical property of W. Kelly Gregory, Randolph J. Thomas, and Robert Fertitta, the aforesaid contract carriers by motor vehicle operating under authority of permits issued by the Interstate Commerce Commission.

7. On April 17, 1959 the Interstate Commerce Commission issued a temporary order authorizing W.K.G., Inc. to lease the ICC operating rights and certain property of Frank and John Watson, trading as Watson Brothers, for a period not to exceed 180 days.

a party only in extraordinary situations and in the discretion of the court. See Local No. 149, I.U., U.A., A. & A.I.W. v. American Brake Shoe Co., 298 F.2d 212 (4th Cir. 1962).

8. This stipulation of facts was signed by attorneys of all parties and incorporated into the pretrial order of June 20, 1968.

8. On April 26, 1959 W.K.G., Inc. commenced operations under the temporary authority issued to it by the Interstate Commerce Commission on April 17, 1959.

9. On August 28, 1959 the Interstate Commerce Commission issued an order reading in part as follows:

"That the purchase by W. Kelly Gregory, Inc. of Baltimore, Maryland of the operating rights and certain property of Frank Watson and John Watson all of Baltimore, and Robert Fertitta of Arnold, Maryland and acquisition by W. Kelly Gregory, Randolph J. Thomas and Robert Fertitta of control of W. Kelly Gregory, Inc. through stock ownership and of said operating rights and property through the purchase be and they are hereby approved and authorized, subject to the terms and conditions set out in the findings in the said report."

Included in the findings of the Interstate Commerce Commission was the following:

"Employees of Watson, other than the two partners, and those of Kelly Gregory, Thomas and Fertitta, would not be affected by the transaction and, in fact, the applicants estimate that additional employees will be required." On October 5, 1959 the transaction authorized by the Interstate Commerce Commission on August 28, 1959 was consummated and W. Kelly Gregory, Randolph J. Thomas and Robert Fertitta ceased to operate as individuals. Their employees became employees of W.K.G., Inc. All aspects of seniority for these employees including the allocation of earning opportunities were determined on the basis of the entire length of service with the individual employers, namely Watson Brothers, W. Kelly Gregory, Randolph J. Thomas and Robert Fertitta.

10. In November, 1959 the Interstate Commerce Commission permit No. 119196 was issued to W.K.G., Inc., granting to W.K.G., Inc. the identical authority formerly held by Watson Brothers, W. Kelly Gregory, Randolph J. Thomas and Robert Fertitta, respectively.

11. Southern was a party to the collective bargaining agreement covering the period from 12:01 A.M. August 1, 1961 until 12:01 A.M. August 2, 1964 (Exhibit B).

12. On October 3, 1959 George W. Krill, Inc. (Krill), a motor carrier operating under authority of a permit issued by the Interstate Commerce Commission of the United States and hauling pursuant to a contract for the A & P, went out of business. Krill was a member of the voluntary association of contract carriers serving the A & P Food Stores in the Baltimore area, which association was known as the "Company" in Exhibit A, the collective bargaining agreement covering the period from August 1, 1958 to August 1, 1961. On October 3, 1959 a number of Krill's former employees were hired by Southern, a member of the aforesaid voluntary association and by W.K.G., Inc. Irvin R. Schultz, a former Krill employee and a Plaintiff herein was employed by Southern on that date. On October 3, 1959 these employees were placed at the end of Southern's and W.K.G., Inc.'s respective seniority lists insofar as the allocation of earning opportunities was concerned. The former Krill employees retained all seniority rights which they had acquired under the collective bargaining agreement covering Krill's employees, with respect to health and welfare benefits, vacations and pensions.

13. On June 10, 1964 W.K.G., Inc. submitted an offer to purchase Southern's assets. The offer did not include Southern's Interstate Commerce Commission operating permit.

14. Contemporaneously with its offer to purchase Southern's assets, W.K.G., Inc.'s President, W. Kelly Gregory, met with Harry Cohen, then President of the Union, and advised him that the offer had been made and that the Great Atlantic and Pacific Tea Company ("A & P"), with whom Southern had a contract to transport goods, had advised

W.K.G., Inc. that it would award that contract to W.K.G., Inc. A discussion concerning the employees of Southern followed. After negotiations on the subject, Harry Cohen on behalf of the Union, and W. Kelly Gregory, on behalf of W.K.G., Inc. agreed that all of the employees of Southern would be employed by W.K.G., Inc. In regard to seniority, it was agreed that the Southern employees would be placed in the order of their seniority with Southern at the bottom of W.K.G., Inc.'s seniority roster with respect to allocation of earning opportunities but would retain their seniority rights gained under the Southern contract with respect to vacations, pensions, and health and welfare benefits provided for in the said collective bargaining agreement.

15. On July 29, 1964 the sale of Southern's assets to W.K.G., Inc. was consummated. The sale did not include Southern's Interstate Commerce Commission operating authority.

16. On August 3, 1964 the employees of Southern were employed as employees of W.K.G., Inc. Their seniority was administered in accordance with the agreement between Harry Cohen and W. Kelly Gregory, referred to above.

17. On April 15, 1966 Southern's Interstate Commerce Commission operating authority was sold to Sally Brazdon of Rosenhayn, New Jersey, Federal Register, April 26, 1966, Page 344, Vol. 31, No. 80.

18. No grievance under the procedure specified in the collective bargaining agreement covering the period August 1, 1964 to August 1, 1967 was filed with respect to any controversy arising out of the employment of the former Southern employees by W.K.G., Inc. The collective bargaining agreements covering the period August 1, 1958 to August 1, 1961 and August 1, 1961 to August 1, 1964 did not include any provisions for the processing of grievances of the Plaintiffs. The collective bargaining agreement covering the period August 1, 1964 to August 1, 1967, although not finalized and executed by the parties thereto until March, 1965, was retroactive to August 1, 1964.

19. In May, 1964 a meeting was held between the employees of Southern who were represented by the Union, including the Plaintiffs, and officers of the Union, at the Union Hall, 39 South Street, Baltimore, Maryland. This meeting was chaired by Harold Miller, Union Secretary-Treasurer. At this meeting Mr. Miller informed the Plaintiffs that the Union had been advised that Southern was going out of business, that W.K.G., Inc. was buying the equipment of Southern and that W.K.G., Inc. would probably be awarded a contract by A & P to perform the work formerly performed by Southern. Mr. Miller informed the Plaintiffs that the Union would do what it could to protect their employment. A committee was then formed to contact the A & P and Southern to see if the men could do something to keep Southern in business.

20. In June, 1964 at a regular Union meeting, held at 6000 Erdman Avenue the former Southern employees including Plaintiffs, were told by Harry Cohen, then President of the Union, that after consultation with the representatives of W.K.G., Inc., the Union and W.K.G., Inc. had agreed that all of the employees of Southern would be employed by W.K.G., Inc. and that the said former Southern employees, including Plaintiffs, would retain their seniority rights with respect to vacations, pensions, and health and welfare benefits provided for in the 1958–1961 agreement and in the 1961–1964 agreement but that the said former employees, including the Plaintiffs, would be placed in the order of their seniority with Southern at the bottom of W.K.G., Inc.'s seniority roster with respect to the allocation of earning opportunities.

21. On Aug 9, 1964 a meeting was held between the Plaintiffs and their then attorney and three representatives of the Union: Harold Miller, Secretary Treasurer, Norman Phillips, Vice President, and Samuel Petera, Business Representative. At this meeting Plaintiffs

complained of the decision relative to seniority made known to them by Harry Cohen in June of 1964 as stated above. A discussion ensued. It was agreed at this meeting that the Plaintiffs would follow the procedure provided for in the existing by-laws of the Union by raising the seniority question before the Executive Board of the Union. The only provisions in the by-laws of the Union establishing proceedings for handling the complaints of the employee members of the Union were contained in Section 14(d) and Section 15(f) of the Union by-laws. Section 14(d) is entitled "Powers and Duties of Local Executive Board" and provides as follows:

"On behalf of the local Union, its officers, employees, or members, to initiate, defend, compromise, settle, arbitrate, or release, or to pay the expenses and costs of any legal proceedings or actions of any nature if, in its judgment it shall be necessary or desirable to protect, preserve or advance the interests of the organization."

Section 15(f) is entitled "Duties of Shop Stewards" and provides in part as follows:

"The employer recognizes the right of the Union to designate job stewards and alternates.

The authority of job stewards and alternates so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

1. The investigation and presentation of grievances in accordance with the provisions of the collective bargaining agreement."

A committee was formed and a letter dated August 13, 1964 was (copy attached) sent to Mr. Cohen, then President of the Defendant Union, requesting a consideration of Plaintiffs' complaint. On August 17, 1964 Harry Cohen advised Plaintiff Fogler in accordance with the copy of the letter attached to the amended complaint as Plaintiffs' Exhibit D.

In accordance with the aforesaid letter of Mr. Cohen, the Plaintiffs' committee did appear at this Executive Board meeting on August 25, 1964. At this meeting the committee discussed their seniority status with the Executive Board.

22. At the next general meeting held in September, 1964 the minutes of the Executive Board were read informing the membership of the Board discussion on the seniority issue. Herbert W. Brown, one of the Plaintiffs herein offered a motion to direct that all agreements should contain language providing for the dovetailing of seniority in the event one company took over the work of another. The motion lost. At this meeting Mr. Cohen reported to the membership what had been worked out for the former Southern employees and that the Union had protected their rights as best as it could. A motion was then made to appoint a committee consisting of representatives of every company operating as a contract carrier for A & P and under agreement with the Union, in order to attempt to resolve the seniority issue. Such a committee was appointed.

23. In October, 1964, at the request of Plaintiff Brown, a member of the committee appointed by Harry Cohen, a meeting was held to discuss Plaintiffs' complaint with respect to seniority. The committee appointed by Mr. Cohen consisted of representatives of the Plaintiffs and of employees of other companies operating under the then existing collective bargaining agreement. At this meeting Plaintiff Brown requested that a representative of the International Teamsters' Union be contacted and be present at any future meeting held with respect to Plaintiffs' complaint. In November, a meeting was held consisting of the committee appointed by Mr. Cohen, Mr. Cohen and John Greely, a representative of the Eastern Conference of Teamsters. Before the Plaintiffs' seniority complaint was discussed the said representative of the Eastern Conference of Teamsters informed the com-

mittee representing the Plaintiffs, appointed by Mr. Cohen, that he was familiar with the decision made by Mr. Cohen as President of the Union in June of 1964 with the Defendant W.K. G., Inc. and that he agreed with it. The committee thereafter was given an opportunity to present their views, after which Mr. Greely stated that the decision of Mr. Cohen would stand without change.

24. On or about August 3, 1964 all of the Plaintiffs were employed by W. K.G., Inc., a Defendant. In accordance with the agreement made between the two Defendants in June of 1964, all of the Plaintiffs were placed at the bottom of the seniority list maintained by the Defendant, W.K.G., Inc. relating to the allocation of earning opportunities in the order of their seniority accrued at Southern but retained full seniority as such seniority was accumulated at Southern for the purposes of vacations, health and welfare benefits, and pensions provided for in prior agreements.

[ATTACHMENT].

Baltimore 21225 Maryland

Aug. 13, 1964

Dear Harry:

The group of employees who worked for Southern Motors have nominated a committee composing of five men, and three alternates to appear before the executive board to get it's help in the consideration of their seniority problem, and of seniority problems generally in cases involving union members who may lose seniorty [sic] when their employer goes out of business, or is acquired by another company.

The members of our committee are:

Herbert Brown, Albert Jackson, Irvin Schultz, Joe Stamm, and myself.

The alternates are: Howard Reninger, Spencer Combs, and William Barbs.

We would like to have your permission to appear before the executive board at the next meeting to talk over these points with you.

Please forward all mail to my home address. 600 Cressivell Ave. Baltimore 21225 Maryland and I will take care of notifying the rest of the committee.

Sincerely Yours,

James G. Fogler Sr.