GENERAL TEAMSTERS LOCAL UNION NO. 174, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Allied Employers, Inc., Intervenor.

No. 82–2401.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 16, 1983.

Decided Dec. 20, 1983.

Harold H. Green, Seattle, Wash., for petitioner.

Susan L. Williams, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Council, N.L.R.B., Washington, D.C., was on brief, for respondent.

Warren C. Ogden, Mercer Island, Wash., with whom Mark S. Davidson, Seattle, Wash., and Josephine B. Vestal, Mercer Island, Wash., were on brief, for intervenor.

Before WRIGHT, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Petitioner is one of three Teamsters bargaining units that, for several years, has negotiated contracts with Allied Employers, Inc. (Allied), a multi-employer bargaining association in the State of Washington. Prior to 1977, the bargaining units (the unions) negotiated individually with Allied for three-year contracts in the wholesale grocery industry. In 1977, the unions decided to sit together and conduct one set of negotiations with Allied. Those negotiations proved successful, producing three

separate contracts for each of the three unions. In 1980 the unions and Allied again decided to engage in coordinated bargaining. This time, however, petitioner's members voted overwhelmingly to reject the proposed contract. The only issue before the court is whether petitioner manifested an unequivocal intention to be bound by any agreement ratified by a majority of the unions. If so, its failure to execute the proposed contract in 1980 constituted a refusal to bargain with Allied in violation of section 8(b)(3) of the National Labor Relations Act. 29 U.S.C. § 158(b)(3) (1976). The National Labor Relations Board (the Board) concluded that the coordinated bargaining format contemplated a binding contract upon ratification by a majority of the unions. 265 NLRB No. 59, 111 LRRM 1636 (1982). Because the Board's determination is not supported by substantial evidence, we grant Local 174's petition for review and deny enforcement of the Board's order.

## I. Background

Intervenor Allied, the charging party in the proceedings below, is a multi-employer association which represents approximately 300 employers in collective bargaining negotiations in the greater Seattle area. For several years, Allied has represented wholesale grocers and soft drink bottlers in contract negotiations with the three Teamsters unions involved in this case. The negotiations have produced successive three year contracts in both industries.

Petitioner, General Teamsters Local Union No. 174 (Local 174), one of the largest Teamsters locals in the State of Washington, has represented drivers and loaders employed by wholesale grocers and soft drink bottlers in negotiations with Allied since at least 1968. Robert Cooper, a key witness in the proceedings below, has been secretary-treasurer and chief executive officer of Local 174 since January 1, 1977. He represented Local 174 at the bargaining table during the 1977 and 1980 negotiations with Allied.

Two other Teamsters bargaining units also represent employees of wholesale grocers and soft drink bottlers in contract negotiations with Allied. The smaller of the two is Local 313, which represents approximately 80 drivers. The other bargaining unit consists of five Teamsters locals (the Warehouse Locals) which represent warehouse employees in greater Seattle and Tacoma. Since 1968, the Warehouse Locals have adopted a single contract based on pooled voting. Under a pooled voting arrangement, a majority vote of the total number of affected employees binds all employees, regardless of the votes within each individual local. The largest Warehouse Local, Local 117, is run by Arnold Weinmeister, who is also president of Teamsters Joint Council No. 28 (covering most of the State of Washington and parts of Idaho), and a vice-president of the Teamsters International Union. Weinmeister and his executive assistant, William Grami, participated in the 1977 and 1980 grocery negotiations.

For many years, Allied's negotiations with the unions over the grocery contracts followed an established pattern. Local 174, whose contract expired first, would negotiate an agreement with Allied. The other two bargaining units would then negotiate separately with Allied, but would adopt the same general agreement achieved by Local 174. Although the terms of the three contracts varied in some respects, the overall economic settlements incorporated into the contracts were identical.

In 1974, the traditional pattern of negotiations unraveled. The Warehouse Locals rejected the economic settlement ratified by Local 174 and achieved a better settlement following further negotiations with Allied. Allied subsequently agreed to reopen Local 174's contract to incorporate the better terms. Local 313—the last bargaining unit to consider the 1974 contract—was offered and accepted the settlement negotiated by the Warehouse Locals.

### A. The 1977 Negotiations

Before the 1977 round of grocery negotiations was scheduled to commence, Arnold Weinmeister, a leader of the Warehouse Locals, convened a meeting of Teamsters

representatives to discuss a new "team" approach to negotiations. Weinmeister wanted representatives of all the major locals to sit in on the negotiations between Allied and Local 174 to avoid the problems that had occurred in 1974. William Roberts, an attorney in private practice, advised the unions that presentation of a team of representatives would be legal, but suggested an alternative approach. Instead of having a team of representatives negotiate with respect to Local 174's contract, Roberts recommended that the locals consider "coordinated bargaining" whereby they could negotiate the three contracts simultaneously rather than conduct three separate sessions. The union representatives agreed to present this proposal to Allied.

The day negotiations over Local 174's contract were scheduled to open, a team of union representatives arrived at Allied's offices. The team included Weinmeister, Roberts, Cooper, and representatives of Local 313 and one of the major Warehouse Locals, Local 599. The spokesman for Allied's bargaining team, Richard King, expressed surprise at seeing the other locals represented at the opening of negotiations on Local 174's contract. At that point, Weinmeister proposed that they engage in "coordinated bargaining" to avoid the problems that had occurred in 1974. Roberts cited a case, *General Electric Co. v. NLRB*, 412 F.2d 512 (2nd Cir.1969), as authority for conducting coordinated bargaining. King indicated that he wanted to read the case and caucus with the other members of Allied's bargaining team. Afterwards, at a private meeting with Weinmeister and Roberts in his office, King stated that he had "learned something about coordinated bargaining" and indicated that Allied was "agreeable to coordinated bargaining."

When the full group of union and employer representatives reconvened, the parties discussed the groundrules for the coordinated bargaining structure. The unions would have one spokesman with representatives of the other major locals present at the bargaining table. Although each bargaining unit would still have a separate contract, they agreed to submit the proposed contracts to their memberships for ratification on the same day. Someone on the union side may have said that there would be "one big strike or one big settlement."

At the outset of the 1977 grocery negotiations, Weinmeister was the primary union spokesman. He later was replaced by William Grami. Other union representatives, however, were present at the bargaining table and participated in discussions throughout the negotiations. The parties negotiated an agreement which all three unions voted to ratify.

The coordinated bargaining approach was also incorporated into the soft drink negotiations in 1977 following a similar opening day scenario. Representatives of all the locals showed up on the first day of bargaining for Local 117's contract—the first soft drink contract scheduled to expire. The parties agreed to engage in coordinated bargaining with one set of negotiations producing separate contracts for each local. Allied's spokesman understood that the failure of one local to ratify would be "an internal union problem."

In 1977, Local 174 voted to reject the soft drink agreement, but signed the contract anyway pursuant to an agreement among the unions to pool the votes of all affected employees. The Board relied heavily on Local 174's behavior in the 1977 soft drink negotiations to support its finding that Local 174 intended to be bound by the results of group bargaining in the 1980 grocery negotiations. Yet the soft drink negotiations differed from the grocery negotiations in several important respects. Allied represented a different set of employers and used a different negotiating team and a different spokesman in the soft drink negotiations. Moreover, because Local 174 represented only 65 of the 1200 employees covered by the soft drink agreements, it had not been a dominant force in those negotiations. Finally, unlike the situation in the grocery negotiations, Local 174 was not the first union to sit down with Allied to negotiate a soft drink contract.

## B. *The 1980 Negotiations*

Before the grocery negotiations commenced in 1980, Weinmeister told the Allied representatives that there would be coordinated bargaining "just like the last time." When asked what would happen if one local voted to reject the contract, Weinmeister responded: "It becomes an internal Union matter." Petitioner's representative, Robert Cooper, was present when Weinmeister made that statement, but did not respond to it in any way. Throughout the 1980 grocery negotiations, whenever the question was raised as to what would happen if one local rejected Allied's offer, the response from the union was always the same: that would be "an internal union matter." Nothing else was said concerning the ground rules for negotiations. Union spokesmen did not say that the unions had agreed to be bound by any agreement ratified by a majority of the unions.

Following numerous bargaining sessions, the unions conducted simultaneous votes on their individual contract offers. Local 174 voted overwhelmingly to reject the offer, 286–7, while the other bargaining units voted to ratify. Local 174 immediately went on strike, but discontinued it after failing to receive strike sanction from Joint Council No. 28. At that point, Allied filed an unfair labor practice charge which alleged that Local 174 was bound by the vote of the majority and was "refusing to execute a completed, ratified Agreement" in violation of section 8(b)(3) of the National Labor Relations Act (the Act). 29 U.S.C. § 158(b)(3) (1976). Petitioner has continued to refuse to sign the contract.

The Board's General Counsel issued a complaint against Local 174 and three days of hearings were held before an Administrative Law Judge (ALJ). In his decision, the ALJ made several important credibility determinations, discrediting the testimony of the two major spokesmen in the 1980 grocery negotiations, William Grami and Richard King, along with the testimony of three other employer representatives. General Teamsters Local Union No. 174, No. 19–CB–3873, slip op. at 10–11 (August 5,

1981), *attached to General Teamsters Local Union No. 174*, 265 NLRB No. 59 (1982). (The bulk of the remaining credited testimony was that of Local 174's Robert Cooper and the attorney, William Roberts.) Based on the remaining credited evidence, the ALJ concluded that Local 174 was not bound by the agreement ratified by the other unions.

The Board reversed, resting its findings "solely on credited or uncontradicted record evidence." 265 NLRB No. 59, slip op. at 4–5. The Board concluded that the coordinated bargaining format used in 1977 and in 1980 "contemplated a binding contract upon ratification by a majority of the unions" and that Local 174 had "tacitly concurred" in that "majority ratification principle." *Id.* at 4. In refusing to execute the contract, the Board concluded that Local 174 was refusing to bargain collectively within the meaning of section 8(b)(3) of the Act. The Board ordered petitioner to cease and desist from its activities and to "make whole any employees covered by the contract for any financial losses sustained by them as a result of [its] unlawful refusal to sign the contract." *Id.* at 6 (footnote omitted).

Local 174 filed a petition for review of the Board's decision and order and the Board cross-petitioned for enforcement. Because Allied was the party which brought the charge underlying the proceedings below, we granted its motion to intervene.

## II. DISCUSSION

### A. *Standard of Review*

■ The only issue before us is whether the Board's conclusion—that Local 174 manifested an unequivocal intention to be bound by any agreement ratified by a majority of the unions—is supported by substantial evidence. *See* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Pedro's*

*Inc. v. NLRB,* 652 F.2d 1005, 1007 (D.C.Cir. 1981). We cannot "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464. But even though we cannot substitute our judgment for that of the Board, we must set the Board's findings aside when the record "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or [our] informed judgment on matters within [our] special competence or both." *Id.* at 490, 71 S.Ct. at 465.

■ The standard of review does not change when the Board reaches a conclusion contrary to that of the trier of fact. The Board's conclusion still must be upheld if supported by substantial evidence. *Oil, Chemical and Atomic Workers International Union, Local 4–243 v. NLRB,* 362 F.2d 943, 945–46 (D.C.Cir.1966). Moreover, "where a disagreement between the Board and the A.L.J. does not turn on questions of fact or on credibility of witnesses, no special weight need be given to the conclusions of the A.L.J." *Laborers' District Council of Georgia and South Carolina v. NLRB,* 501 F.2d 868, 873 n. 16 (D.C.Cir.1974). The Board, however, must make clear the basis of its disagreement with the ALJ. *Oil, Chemical and Atomic Workers,* 362 F.2d at 946.

In this case, the Board relied "solely" on credited and uncontradicted testimony in the record to reverse the conclusion of the ALJ. Because the ALJ's credibility determinations are not before us, the "record as a whole" for the purposes of this appeal consists entirely of credited and uncontradicted evidence. Our task is to determine whether there is substantial evidence on *that* record to support the Board's findings.

### B. *Analysis*

■ Group bargaining has long been an accepted form of bargaining under the National Labor Relations Act. *See, e.g., NLRB v. Truck Drivers Local Union No.* *449,* 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). Although most of the cases that address group bargaining involve multi-employer bargaining associations, the principles underlying those cases also apply to group bargaining by unions. Those principles involve the right of employees and of employers to choose their own representatives in formal labor negotiations, a right that is "fundamental to the statutory scheme." *General Electric Co. v. NLRB,* 412 F.2d 512, 516 (2nd Cir.1969). "Both multiunion and multiemployer bargaining ... [have] been widely recognized as an effective way to create stability in collective-bargaining relationships and 'a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining.'" *Brotherhood of Teamsters Local No. 70,* 214 NLRB 902, 905 (1974) (quoting *NLRB v. Truck Drivers Local Union No. 449,* 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957)).

Group bargaining can take many forms. The term "joint bargaining" is commonly used to describe a bargaining arrangement that binds all of the participants. *See, e.g., General Electric,* 412 F.2d at 522. Allied, for instance, is an association of numerous employers, each of which is bound by the contracts negotiated by Allied on its behalf. This arrangement constitutes a form of joint bargaining. On the union side, an agreement to be bound by group action may take several forms, two of which are discussed in this opinion: "pooled voting" and what the Board has labelled "majority ratification." Under a pooled voting agreement, a contract approved by a predetermined majority of affected employees—regardless of their affiliation with a particular local or bargaining unit—will bind all of the employees. The Warehouse Locals, which make up one of the three bargaining units in this case, ratify contracts pursuant to a pooled voting arrangement. Similarly, Local 174 ratified the 1977 soft drink contract pursuant to a pooled voting agreement with the other unions, despite the fact that Local 174's members had voted to re-

ject the contract. Under a majority ratification arrangement, the unions are bound by any agreement ratified by a majority of the affected bargaining units, regardless of the size of those units. In this case, the Board argues that Local 174 agreed to be bound by any contract ratified by the other two bargaining units, not by the results of pooled voting.

■ The test for determining whether a party is bound by the results of group bargaining is well settled. The party must have demonstrated an unequivocal intention to be bound by group action. This court has stated the test in two-part fashion:

> [The test is] whether the members of the group have indicated from the outset an unequivocal intention to be bound in collective bargaining by group rather than individual action, and whether the [association] representing [ ]the employe[rs] has been notified of the formation of the group and the delegation of bargaining authority to it, and has assented and entered into negotiations with the group's representative.

*Western States Regional Council No. 3, International Woodworkers of America v. NLRB,* 398 F.2d 770, 773 (D.C.Cir.1968) (citations omitted). An unequivocal intention to be bound by group action need not be expressed in a written agreement. We have recognized that "group activity can and does range over a wide spectrum of habits, practices, and understandings, explicit and implicit, which makes generalization more hazardous than usual." *Retail Clerks Union No. 1550 v. NLRB,* 330 F.2d 210, 216 (D.C.Cir.1964). Thus a party may rely on "apparent, as well as express, delegation of authority" in consenting to engage in joint bargaining. *NLRB v. Beckham, Inc.,* 564 F.2d 190, 194 (5th Cir.1977); *see also NLRB v. Dover Tavern Owners' Association,* 412 F.2d 725, 727 (3rd Cir.1969). Moreover, the unequivocal intention can be inferred, in part, from a "course of conduct." *See Joseph McDaniel,* 226 NLRB 851, 853 ("An employer who, through a course of conduct or otherwise, signifies

that it has authorized the group to act in its behalf will be bound by that apparent creation of authority.") (footnote omitted), *enforced sub nom. NLRB v. Beckham, Inc.,* 564 F.2d 190 (5th Cir.1977). It is therefore appropriate for the Board to look at the particular facts of each case to determine whether the parties intended to be bound by group action.

Although the Board has considerable discretion in making this case-by-case determination, the legal standard which the Board must apply is stringent. The intention to be bound must be unequivocal—it cannot be ambiguous or susceptible to numerous interpretations by the party who consents to engage in group bargaining.

The problem with the Board's holding in this case is that the Board stretched the meaning of "unequivocal" beyond recognition. The factual support for the Board's theory consists of a fragile collection of inferences built upon inferences. Its conclusion simply is not supported by substantial evidence.

■ The Board explained its finding of an unequivocal intention to be bound as follows:

> [I]t is clear ... that the parties' coordinated bargaining format in 1977, and again in 1980, contemplated a binding contract upon ratification by a majority of the unions, and that [Local 174] tacitly concurred therein based on its acquiescent participation in the negotiations, its execution of a prior contract over its members' rejection, and its failure to notify the association at any time of its rejection of the majority ratification principle.

265 NLRB No. 59, slip op. at 4. The central assertion, upon which the Board's entire judgment rests, is that the parties "contemplated a binding contract upon ratification by a majority of the unions." If the Board is incorrect about that inference, then the entire house of cards collapses. Petitioner's "acquiescent participation" in coordinated bargaining in 1980 and its failure to "notify the association ... of its rejection of the majority ratification principle" have no

meaning unless that principle was adopted by the unions.

The Board relies on the total context of the negotiations and the course of conduct of petitioner to demonstrate the existence of the requisite intent. In particular, the Board emphasizes several factors: the background of the 1977 coordinated bargaining proposal; the "one big strike or one big settlement" statement at the outset of the 1977 grocery negotiations; petitioner's execution of the 1977 soft drink contract despite rejection of the contract by its membership; and the statement that, if one local failed to ratify the contracts, that would be "an internal union matter." An analysis of these factors, especially in light of the other evidence on the record, demonstrates the weakness of the Board's position. *See Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

As a preliminary matter, we note that no union representative stated that the unions intended to be bound by majority ratification. Moreover, although the parties agreed to negotiate through one primary spokesman, they still voted on three separate contracts. The final agreement reflected an economic settlement that was identical for all three contracts, but contained individual issues for each union which were worked out at the bargaining table. Although we recognize that "[t]he signing of individual contracts does not negate the existence of a multi-[union] unit," *Dover Tavern,* 412 F.2d at 727 n. 4, there must be other evidence supporting the existence of such a unit.

The Board argues that the background of the 1977 grocery negotiations supports an inference that the unions intended to be bound by majority ratification. It is clear that the unions' purposes in using coordinated bargaining were to avoid another breakdown in negotiations like the one that had occurred in 1974 and to obtain similar economic settlements. But these factors support an inference that the unions intend-

ed to sit at the same table for negotiation purposes, not that they unequivocally intended to be bound by majority agreement. In fact, the background of the 1977 grocery negotiations suggests that the unions did *not* intend to be bound by majority ratification.

The union representatives used the term "coordinated bargaining" to describe the group bargaining arrangement to Allied. They did not refer to "joint bargaining"—a term commonly used to describe a binding group bargaining arrangement. Moreover, the union attorney cited the *General Electric* case to explain the proposal to Richard King and the other Allied representatives. In *General Electric,* the court rejected the employer's contention that the united bargaining front presented by the unions amounted to an imposition of joint bargaining to which the employer did not want to assent. 412 F.2d at 522–23. The court upheld the legality of a coordinated bargaining format and ordered the company to bargain with the union despite the presence of representatives of other bargaining units at the table. Considered as a whole, the background of the 1977 grocery negotiations does not support the Board's conclusion.

The Board also places considerable emphasis on petitioner's signing of the 1977 soft drink contract to support the inference that it unequivocally intended to be bound by majority ratification. Although Allied was not informed of any agreement between the unions at the time the soft drink contracts were executed in 1977, it did know that petitioner's membership had voted to reject the contract. In light of this information, the Board concludes that it was reasonable for Allied to infer from petitioner's acceptance of the contract, that petitioner was bound by any agreement ratified by a majority of the unions. The irony of this position is that petitioner in fact signed the contract pursuant to an agreement to pool its votes with the other locals. Yet the Board has not taken the position that there was such a pooled vote agreement in the 1980 grocery negotiations.

Thus the analogy to the 1977 soft drink negotiations is flawed. Even assuming *arguendo* that there was a pooled vote agreement in both sets of negotiations, it is not clear from the record that a majority of individual employees voted to ratify the 1980 grocery agreement, but only that two out of the three bargaining units had enough votes to ratify.

The central weakness in the Board's reliance on the 1977 soft drink agreement is that petitioner occupies very different bargaining positions in the soft drink and grocery industries. Petitioner is one of the dominant locals in the grocery industry and traditionally led the grocery negotiations by bargaining to settlement *before* the other unions met with Allied. In contrast, Local 174 was never the leader in the soft drink negotiations and represented only 65 of the 1200 workers covered by those agreements. The union's bargaining positions in the two sets of negotiations varied considerably. It is unreasonable to infer that Local 174's behavior in the soft drink negotiations, where it was a minor player, would be repeated in negotiations where it was a dominant union.

Given that the "background" of the 1977 grocery negotiations and petitioner's signing of the 1977 soft drink agreement provide little support for the Board's conclusion, the Board relies heavily on the two statements made at the outset of the 1977 and 1980 grocery negotiations: that there would be "one big strike or one big settlement" and that the failure of a union to ratify the agreement would constitute an "internal union matter." Neither statement indicates that the unions were binding themselves to a majority ratification principle. These statements do not indicate an unequivocal intention to adhere to any settlement ratified by two out of the three bargaining units. In light of the agreement to continue with three separate contracts, which contained some distinct provisions for each union, the "one big strike or one big settlement" statement in 1977 is ambiguous. Robert Cooper could not recall the statement, but testified that it might have been said as a bargaining tool to present a united front to Allied. Nor was the ambiguity of the 1977 statement clarified by the repeated statement in 1980 that rejection of the agreement by one bargaining unit would constitute "an internal union matter." The events that transpired following petitioner's rejection of the contract demonstrate that the phrase "internal union matter" is susceptible to more than one interpretation. After it rejected the agreement, Local 174 failed to receive strike sanction from its Joint Council. Robert Cooper testified that he always thought "internal union matter" referred to whether the rejecting local would be able to go on strike.

The evidence relied upon by the Board—the background of the 1977 grocery negotiations, petitioner's signing of the 1977 soft drink agreement, and the two statements made by union representatives—does not support its conclusion that Local 174 manifested an unequivocal intention to be bound by an agreement ratified by a majority of the unions. Because there was no apparent agreement among the unions to be bound by majority ratification, the fact that Cooper "acquiesced" in the 1980 agreement to engage in "coordinated bargaining, like the last time" adds nothing to the Board's argument. Similarly, the Board's contention that Cooper "tacitly concurred" in the "majority ratification principle" by remaining silent when the "internal union matter" statement was made in 1980 is also incorrect because no such principle can be inferred from the evidence. *Compare McAx Sign Company, Inc. v. NLRB*, 576 F.2d 62, 67 (5th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979) (where an employer's "failure to reserve the right to dissent" to a wage increase that had been agreed to in group bargaining and which the employer had in his possession for nearly a month, supported an inference that the employer intended to be bound by group action). The Board's reliance on Cooper's "acquiescence" and "tacit concurrence" in the 1980 bargaining format tends to confuse two distinct legal issues: whether petitioner bound itself to the results of group bargaining and whether, once having done so, petitioner met the stringent requirements for withdrawing from such a bar-

gaining arrangement. *See Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982) (describing the circumstances under which a party may withdraw from joint bargaining). Cooper's silence during the 1980 negotiations does not affect our conclusion that there is insufficient evidence to support the Board's finding that Local 174 manifested an unequivocal intention to be bound by group action.

### CONCLUSION

Affirmance of the Board's conclusion would deprive the word "unequivocal" of all meaning. We decline the invitation. When stripped of its conclusory tone, the Board's analysis of the evidence consists of a thin thread of equivocal inferences, many of which presuppose the existence of the agreement sought to be proved. The gossamer weave produced by the Board cannot form even a minimum measure of evidence necessary to sustain the Board's decision. Inferences to the third degree and statements capable of many parsings cannot support a finding that the parties "unequivocally" manifested an intention to be bound by group action. We grant Local 174's petition for review and deny enforcement of the Board's order.

*It is so ordered.*