Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

Argued March 20, 2003                Decided July 8, 2003

No. 01-1456

INTERNATIONAL ALLIANCE OF THEATRICAL AND STAGE EMPLOYEES,
GREATER NEW ORLEANS STAGE, MOTION PICTURE,
TELEVISION AND EXHIBITION EMPLOYEES,
LOCAL 39, AFL–CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

FREEMAN DECORATING COMPANY, ET AL.,
INTERVENORS

—————

Consolidated with
01–1504, 01–1509, 02–1035

—————

On Petitions for Review and Cross–Applications
for Enforcement of an Order of the
National Labor Relations Board

—————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Philip A. Franco* and *Curtis Mack* argued the cause for petitioners Freeman Decorating Company, et al. With them on the briefs were *William J. Kelly III, William Lurye, Dannie B. Fogleman* and *David A. Rosenberg. Robert Markle, Richard B. Hankins* and *Peter J. Petesch* entered appearances.

*James D. Fagan, Jr.* argued the cause and filed the briefs for petitioner International Alliance of Theatrical and Stage Employees, Greater New Orleans Stage, Motion Picture, Television and Exhibition Employees, Local 39, AFL–CIO. *Robert S. Giolito* entered an appearance.

*James M. Oleske, Jr.*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Separate opinion filed by *Circuit Judge* TATEL concurring in part and dissenting in part.

SENTELLE, *Circuit Judge*: Several parties petition for review of the National Labor Relations Board's (NLRB or the Board) ruling that the petitioning employers in this case committed an unfair labor practice by refusing to accept referrals from a local union hiring hall, after the union engaged in an illegal strike. We reverse the Board and hold that the hiring hall registrants lost the protection of the National Labor Relations Act (NLRA or Act) when the union engaged in an illegal strike. Central to this conclusion, we hold that each hiring hall registrant was an "employee who engage[d] in a strike" within the meaning of Section 8(d) of the Act, 29 U.S.C. § 158(d) (2000), regardless of whether the registrant was on referral to an employer at the time the strike was called.

## I. Background

This petition involves nine employers (Employers)[1] and two unions (Local 39 and the Carpenters),[2] each of which challenges the Board's ruling. The Employers provide installation, decorating, and related services for conventions held in the New Orleans area. Prior to July 1, 1997, Local 39 had individual contracts with approximately eighty employers, including the Employers involved in this petition. These contracts provided that the signatory Employers would hire workers in the New Orleans area exclusively from Local 39's hiring hall. Pursuant to the contract, when one of the Employers needed labor, it called Local 39's hiring hall. Local 39 then called individuals on its referral list to attempt to fill the request. Employees were not allowed to contact Employers directly to solicit work. The hiring hall had a registry of 446 journeymen, who were eligible for membership in Local 39, and 1,885 "helpers" who were not eligible for membership. Anyone registered with the hiring hall could be referred to any of the signatory Employers, but a number of the registrants had never been referred to any of the Employers involved in this case. Due to the transitory nature of the convention business, individual employees would often be referred to an Employer for short periods of time, sometimes only a single day.

Local 39's contracts with the Employers were set to expire on June 30, 1997. In April 1997, Local 39 sent timely notice to the Employers of its intent to renegotiate the contracts, and bargaining ensued. However, the parties did not reach

---

[1] Freeman Decorating Co., GES Exposition Services, Inc., Convention Service, Inc. of Pennsylvania, Expo Services, Sho–Aids, Inc., Czarnowski Display Services, Inc., Renaissance Management., Inc., Zenith Labornet, Inc., and W.H. Bower Spangenberg, Inc. (represented in this petition by its trustee in bankruptcy).

[2] International Alliance of Theatrical and Stage Employees, Greater New Orleans Stage, Motion Picture and Exhibition Employees, Local 39, AFL–CIO (Local 39) and the United Brotherhood of Carpenters and Joiners of America, Louisiana Carpenters Regional Council, AFL–CIO (Carpenters).

an agreement, and the contracts expired without successor agreements on June 30, 1997. On that date, at a meeting attended by 126 of its members, Local 39 voted to go on strike against the Employers on July 1. At the time of the strike, only three hiring hall registrants were on referral to one of the Employers, and none of these three is an alleged discriminatee in this case.

By July 2, Local 39 had set up picket lines. For the next three weeks, Local 39 did not refer any of its hiring hall registrants to the Employers. Despite calls for labor, none of the hiring hall registrants worked for any of the Employers or attempted to disassociate themselves from the strike. Consequently, the Employers were left with no source of labor during a busy convention that began several days after the strike. Bargaining continued during the strike and several contract offers were exchanged and rejected.

Through inquiries with the Federal Mediation and Conciliation Service (FMCS), the Employers learned that Local 39 had failed to file a dispute notice with the FMCS thirty days before calling a strike, as required by Section 8(d)(3) of the NLRA, 29 U.S.C. § 158(d)(3). It is undisputed that Local 39's failure to file the required notice made its strike illegal under Section 8(d)(4) of the Act.

On July 22, 1997, six of the Employers faxed a "Notice of Termination" to Local 39, which stated that "all employees covered under the Local 39 Labor Agreement with any of the signatory employers indicated below are hereby terminated for participating in an illegal strike." Within the week, the six Employers mailed copies of the termination notice to over 2,600 individuals represented by Local 39, including anyone who had ever been referred to a job by the Local 39 hiring hall.

On July 23 or 24, Local 39 attempted to accept any contract offer that was still on the table from the largest Employer, GES, but was informed that GES no longer recognized Local 39 and had terminated all "Local 39 employees." On July 26, Local 39 sent a letter to all of the Employers purporting to end its economic strike and attempting to accept the Employ-

ers' contract proposal it had rejected in mid-July. The Employers responded that the contract proposal had been withdrawn, that they had no obligation to bargain with Local 39, and that all strikers had been terminated.

Three of the Employers–Zenith, Renaissance, and Eagle–did not sign the July 22 termination letter, but sent similar letters to Local 39 in August. They did not, however, send copies of their letters to the hiring hall registrants, and Local 39 submitted a request to Zenith and Eagle asking for the names of the individuals affected by the termination notices. Zenith and Eagle refused to provide that information.

In late 1997, Freeman and GES, the two largest Employers, signed contracts with the Carpenters Union, which also operates a hiring hall, to replace Local 39 as their labor source. In early 1998, in preparation for the Board hearing in this case, an attorney for GES contacted a number of the hiring hall registrants who had received termination letters and questioned them over the telephone.

Local 39 filed an unfair labor practice charge alleging that the Employers' and the Carpenters' actions violated the Act. On September 28, 2001, the Board issued a decision and order. The Board found that the Employers violated Sections 8(a)(3) and 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) & (3), by announcing the terminations of over 2,200 individuals who had used Local 39's hiring hall. The Board reasoned that although the strike was unlawful, the hiring hall registrants were not "employee[s] who engage[d] in a strike" under Section 8(d) and thus did not lose the protection of Section 8(a) of the Act. 29 U.S.C. § 158(d). They were not "employee[s]," the Board determined, because none of the registrants was on referral to an Employer at the time the strike was called. Moreover, even if the registrants were employees, the Board held that the Employers had failed to show that any of the hiring hall registrants "engage[d] in [the] strike" by deliberately withholding labor from the Employers.

The Board declined, however, to find that the Employers violated the Act by announcing the terminations of 330 other hiring hall registrants because the Board deferred to the

General Counsel's decision not to include these individuals in the unfair labor practice charges.

In addition, the Board ruled that the Employers violated Sections 8(a)(5) and 8(a)(1) by withdrawing recognition from Local 39; that Zenith and Eagle violated Sections 8(a)(5) and 8(a)(1) by refusing to provide Local 39 with information relevant to its representation duties; that Freeman and GES violated Sections 8(a)(2) and 8(a)(1) by entering into a collective bargaining agreement with the Carpenters; that the Carpenters violated 8(b)(1)(A) by acting as the representative of employees that Local 39 had the exclusive right to represent; and that GES violated Section 8(a)(1) by interrogating employees about their union activities.

The Board issued a remedial order requiring the Employers and the Carpenters to cease and desist from their "unlawful" conduct. The Employers were ordered to rescind the announced discharges–*i.e.*, begin to accept referrals from Local 39; recognize and bargain with Local 39 upon request; and post remedial notices. The Carpenters and the two Employers with whom they entered into collective bargaining agreements (Freeman and GES) were ordered to rescind those agreements and jointly and severally disgorge certain dues, fees, and benefit contributions.

In addition, the Board remanded the matter to the ALJ for a determination of whether individual hiring hall registrants might also be entitled to instatement and backpay in addition to the other relief ordered. The Board stayed the remand proceedings pending the outcome of this petition for review.

The Employers and Carpenters petitioned for review of the Board's ruling that they had violated the Act. Local 39 petitioned for review of the Board's ruling that the Employers' termination of 330 of its members was lawful. The Board filed a cross-application for enforcement of its order.

## II. Analysis

### A. Standard of Review and Statutory Background

This Court will not disturb an order of the NLRB unless, reviewing the record as a whole, it appears that the Board's

factual findings are not supported by substantial evidence, 29 U.S.C. § 160(e), or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue. *Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994). When the Board's decision turns on its interpretation of the NLRA, the familiar two-step *Chevron* test applies. *Jacoby v. NLRB*, 325 F.3d 301, 308 (D.C. Cir. 2003) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984)).

The NLRA grants statutory rights to both employees and employers. *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 88 (1995). As relevant here, the Act secures employees' rights to unionize and engage in union activities by forbidding employers from interfering with these rights, 29 U.S.C. § 158(a)(1)-(2); from discriminating on the basis of union membership or activity, § 158(a)(3)-(4); and from refusing to bargain collectively with a duly elected union, § 158(a)(5). Importantly, the Act grants these rights only to "employees," as defined by the Act in Section 2(3). *Town & Country*, 516 U.S. at 89. Section 2(3) states that "[t]he term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise . . . ." 29 U.S.C. § 152(3). The Supreme Court and this Court have, consistent with the Act's expansive definition covering "*any* employee," broadly interpreted the term "employee," holding it to include individuals outside direct employment relationships, such as job applicants, *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 190–93 (1941), and auxiliary choristers who are "on call" to perform as necessary, *Seattle Opera v. NLRB*, 292 F.3d 757, 761–65 (D.C. Cir. 2002). *See also Town & Country*, 516 U.S. at 90–92 (discussing broad construction of the term "employee"). Most importantly for our purposes, the Supreme Court and the NLRB have squarely held that hiring hall members are "employees" protected by the Act. *See Teamsters Local 357 v. NLRB*, 365 U.S. 667 (1961); *see also Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 168 (1971) (noting that Board considers hiring hall registrants "employees" under the Act); *Int'l Bhd. of Teamsters, Local*

*Union 104*, 325 NLRB No. 121 (1998) (holding that hiring hall registrants are protected by the Act); *Int'l Longshoremen's Ass'n, Local 872*, 163 NLRB 586 (1967) (same).

In addition to granting rights to employees and employers, the Act imposes certain responsibilities as well. Central to this case, Section 8(d)(3) requires a union to notify the Federal Mediation and Conciliation Service within thirty days after it notifies the employer of a dispute over the terms of the contract. 29 U.S.C. § 158(d)(3). This requirement is designed to provide the parties an opportunity to mediate their disputes and to avert labor strife. Not surprisingly, then, the Act provides drastic consequences when a union goes on strike without first notifying the FMCS. Specifically,

> [a]ny employee who engages in a strike within any notice period specified in this subsection . . . shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160[.]

29 U.S.C. § 158(d). In other words, if an "employee . . . engages in a strike" within the FMCS notice period, he forfeits his rights under the Act, and thus may be lawfully terminated by his employer. As explained above, it is undisputed that Local 39 struck without giving the required notice, and thus called an unlawful strike. The only question, then, is whether the individual hiring hall registrants were "employee[s] who engage[d] in a strike." If they were, they lost their status as employees of the Employers and lost the protections of Section 8(a) of the Act; consequently, the Employers did not violate Sections 8(a)(1) & (3) by "terminating" the hiring hall registrants. *See United Furniture Workers of Am., AFL–CIO v. NLRB*, 336 F.2d 738 (D.C. Cir. 1964). If the hiring hall registrants were not "employee[s] who engage[d] in a strike," they retained the protection of Section 8(a), and the Employers violated the Act if they terminated the registrants because of anti-union animus.

The Board ruled that the hiring hall registrants were not "employee[s]" within the meaning of Section 8(d) because none of them was on referral to an Employer at the time the

strike was called. To reach this conclusion, the Board interpreted "employee[s]" in Section 8(d) more narrowly than the general statutory definition of employee in Section 2(3). The Board reasoned that Section 8(d) falls within the exception to Section 2(3), which states that the meaning of the term "employee" may "be limited to the employees of a particular employer" if the statute explicitly states the limitation. The Board held that Section 8(d)'s coverage clause–"any employee who engages in a strike"–must be read in light of the loss of status clause–"an employee of the employer engaged in the particular labor dispute." Read as a whole, the Board reasoned that Section 8(d) states an explicit limitation on the usual definition of "employee" since "[o]nly someone who first *has* the status of an employee of a particular employer can *lose* that status." The Board concluded that none of the hiring hall registrants were "employee[s] of the employer engaged in the particular labor dispute" because none was on referral to an Employer at the time the strike was called, and thus no "current employment relationship existed." Consequently, the Board held that the hiring hall registrants retained the protections of Section 8(a)(1) & (3), and that the Employers violated those sections by terminating them.

B. "Employee[s]"

We review the Board's interpretation of Section 8(d) under the two-step framework provided in *Chevron*, 467 U.S. at 842–43. At step one we ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If Congress unambiguously addressed whether hiring hall registrants fall within Section 8(d), "that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If the statute is ambiguous, we move to *Chevron*'s second step and ask whether the Board's interpretation is "a permissible construction of the statute" to which this Court must defer. *Id.* at 843.

At the first step of *Chevron*, we conclude that Congress did not unambiguously address the "precise question at issue." *Id.* at 842. Section 8(d) does not mention hiring hall regis-

trants, nor does the general definition of "employee" in Section 2(3). To be sure, the Supreme Court has held that the Act covers hiring hall registrants, but neither this Court nor the Supreme Court has addressed whether the broad definition of employee is incorporated in Section 8(d), much less whether Section 8(d) covers only hiring hall registrants engaged in a direct employment relationship at the time a strike is called. Thus, we turn to *Chevron* step two to determine whether the Board's interpretation of Section 8(d) is reasonable. We conclude that it is not.

First, the Board improperly reads Section 8(d)'s loss of status clause as a limitation on the term "any employee." When read in light of the structure and purpose of Section 8(d), however, the loss of status clause is not an explicit limitation of the term "employee" for purposes of Section 2(3). Rather, the loss of status clause delineates the extent of the loss of status that occurs when an employee engages in an unlawful strike–*i.e.*, the employee only loses his status as "an employee of the employer engaged in the particular labor dispute;" he does not lose the Act's protection for all time or for all employers. Contrary to the Board's interpretation, the loss of status clause does not tell us what type of employee is capable of losing his status. The coverage clause of Section 8(d) accomplishes this function, telling us that "*any employee* who engages in a strike" will lose the protection of the Act as to the specified employers. Importantly, "employee" is explicitly modified only by "any" and "who engages in a strike." "Any" signals that "employee" should receive its broadest statutory definition, which both the Court and the Board have consistently held to include hiring hall registrants and other "on call" workers, regardless of whether they are engaged in a direct employment relationship. *See supra* at 7–8. Accordingly, the term "employee" includes hiring hall registrants, if they are capable of "engag[ing] in a strike." Hiring hall registrants–even those not on referral to a particular employer–are capable of striking by refusing to work for any signatory Employer. Therefore, viewed in light of the structure of Section 8(d) and Court precedent, hiring hall registrants are "employees" within the meaning of Section

8(d), even if they are not on referral to a particular employer. Inasmuch as the Board's contrary interpretation of Section 8(d) is in conflict with both interpretive precedent and the statute's structure, it is unreasonable.[3]

Furthermore, the Board's reading of Section 8(d) renders the Act internally inconsistent and reads many hiring hall registrants out of Section 8(d) on an arbitrary basis. The Board, in essence, creates an entire category of employees who enjoy NLRA rights, but do not shoulder its responsibilities. Under the Board's interpretation, all hiring hall registrants are protected by the Act, but registrants only lose protected status if they happen to be on referral to a particular employer at the time an unlawful strike is called. The practical result of the Board's holding is that many unlawfully striking hiring hall workers will suffer no consequences from their unlawful behavior. Besides the internal inconsistency produced by the Board's reading, the Board's reading produces absurd results in individual cases. In this case, hundreds of registrants unlawfully denied their labor to the Employers. Yet only three of these strikers forfeited their rights under the NLRA–those who happened to be on a job the day the strike was called. This result is utterly arbitrary when hundreds of registrants had direct employment relationships with the Employers in the recent past and would likely have been employed again in the near future but for the strike. Moreover, unions could easily exploit the statutory

---

[3] While our colleague's suggestion that "if the court believes that section 8(d)'s plain language, structure, and purpose require that the section apply to all statutory 'employees,' then it should have rejected the Board's interpretation at *Chevron* step one," Dissent at 1–2, has a certain allure, we do not find the statute to be so plainly unambiguous as to compel our rejection of the Board's interpretation at step one. The Supreme Court has from the beginning in its application of *Chevron* considered the language, structure, and purpose of statutes in evaluating the reasonableness of agency interpretations of ambiguous congressional language. *See, e.g.*, *NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 125 (1987); *Immigration & Naturalization Serv. v. Cardoza–Fonseca*, 480 U.S. 421, 445–46 & n.29 (1987).

gap caused by the Board's interpretation by initiating an unlawful strike during a slow referral period and continuing to withhold labor throughout a busy season. The employer would then be faced with the distasteful choice of "terminating" the hiring hall registrants and incurring unfair labor practice charges or acceding to the union's demands, no matter that they were raised unlawfully. Indeed, that hypothetical is close to the facts of this case. Such conduct is inconsistent with the system of notification and mediation established in Section 8(d). The Board's reading upsets the statutory balance struck by Congress and leads to irrational results in practice. Consequently, its interpretation is unreasonable under *Chevron* step two.

C. "Engages in a strike"

Having held that hiring hall registrants are "employee[s]" within the meaning of Section 8(d), we similarly reject the Board's alternative holding that the hiring hall registrants retained protection of the Act because the Employers failed to show that the registrants "engage[d] in a strike." The Board held that the Employer was required to produce evidence that each registrant deliberately withheld labor when he was given the opportunity to work. We find this holding contrary to law, arbitrary and capricious, and unsupported by substantial evidence.

By requiring the Employers to produce evidence that each registrant deliberately withheld labor, the Board acted contrary to the plain language of Section 8(d) and longstanding precedent of the Board and this Court. Perhaps most importantly, the Board set a standard that could never be met in the hiring hall context. Under the contract between Local 39 and the Employers, the hiring hall registrants were unable to contact the Employers directly to seek work. Moreover, the union controlled the referral process and refused to refer a single registrant despite the Employers' repeated request for workers. It was therefore impossible for the Employers to demonstrate that each hiring hall registrant deliberately withheld labor because the Employers' requests never reached the registrants, and it is unclear that Employers

could ever have directly contacted the hiring hall registrants while Local 39 purported to represent them. Despite these facts precluding individualized proof, the Board went so far as to opine that even picketing hiring hall registrants–who plainly supported the strike–did not engage in the strike unless the Employers could prove that each one turned down a request for work from the Employer. This assertion borders on the absurd. In any event, even if the Board's standard were correct, its decision could not stand on the present record because the ALJ did not allow the Employers to introduce evidence that each registrant deliberately withheld labor from the Employers, and indeed scoffed at the notion that such evidence was necessary.

The hiring hall registrants "engage[d] in a strike" as surely as traditional employees who walk off the job site. The deprivation of labor was total. During a busy convention, the Employers received no workers from their exclusive labor source, the Local 39 hiring hall. Under such circumstances, to hold that not a single employee engaged in a strike is irrational. In its ruling, the Board recognized that its precedent held that individual employees "engage in a strike" when the union calls an unlawful strike and employees do not present themselves for work, unless the General Counsel presents evidence that the employees did not support the strike. For example, in *Bechtel Corp.*, 200 NLRB 503 (1972), which involved, among others, hiring hall employees, *id.* at 505, 507, the Board held that eighteen employees "engage[d] in a strike" called by their union, despite their claims that they did not come to work due to an authorized leave of absence. *Id.* at 508–13. The Board inferred from their membership in the striking bargaining unit and their failure to affirmatively disavow the strike that they engaged in the strike when they failed to present themselves for work. *Id. Accord Marathon Elec. Mfg. Corp.*, 106 NLRB 1171 (1953), *enf'd*, 223 F.2d 338 (D.C. Cir. 1955). Nonetheless, the Board contends that *Bechtel* and *Marathon* have been undercut by a line of precedent involving unions engaging in *lawful* strikes. *See Park Manor Nursing Home*, 312 NLRB 763, 766–67 (1993); *Toledo (5) Auto/-Truck Plaza*, 300 NLRB 676 n.2

(1990), *aff'd* 986 F.2d 1422 (6th Cir. 1993); *Texaco, Inc.*, 285 NLRB 241, 246 (1987); *Conoco, Inc.*, 265 NLRB 819, 821 (1982); *Emerson Elec. Co.*, 246 NLRB 1143, 1143 (1979), *enf'd in relevant part*, 650 F.2d 463 (3d Cir. 1981). In these cases, the Board held that the employer may not infer strike support from mere absence when there is another plausible reason for the absence, such as sickness or disability; rather the Board requires individual proof of strike support in the case of these lawful strikers. The Board argues that this line of precedent applies here because individual hiring hall registrants also have reasonable grounds for absence since by nature of the hiring hall process, at any given time many of the hiring hall registrants are not on referral to an employer, regardless of whether a strike has been called.

None of the cases cited by the Board, however, addressed unlawful strikers, nor even cited *Bechtel* or *Marathon*, much less overruled them. The Board utterly failed to explain why a standard developed for lawful strikers should be applied to unlawful strikers. Contrary to the Board's position in this case, Board precedent has long recognized the distinction between lawful strikers–for whom individual proof of strike support may be required–and unlawful strikers–who are presumed to "engage in [the] strike." *See Bechtel*, 200 NLRB at 513 n.11. The Board obliterated this essential distinction without explanation. Consequently, the Board acted arbitrarily by applying a standard designed to safeguard the protected conduct of *lawful* strikers and ignoring relevant precedent holding that employees represented by a striking union are presumed to have engaged in the strike. The Board's ruling directly contravenes Section 8(d), which provides that unlawful strikers lose the protection of the Act and contravenes common sense by effectively presuming that every single hiring hall registrant has a reasonable excuse for his absence despite the fact that the Employers were totally deprived of labor. The Board may not, consistent with Section 8(d), treat illegally striking hiring hall workers the same as sick or disabled members of a lawfully striking union merely because hiring hall workers are not expected to show up at work every day.

By requiring employers to prove that individual hiring hall registrants deliberately withheld labor, the Board effectively reads hiring hall workers out of Section 8(d), much as it did by misinterpreting the term "employee." In many cases, as here, it will be impossible for an employer to produce individualized proof because the union controls the hiring hall referral process and refuses to pass on employer requests for work to employees. The result is that a union can call an unlawful strike with impunity, knowing that its individual registrants retain protection of the Act. Such a rule turns Section 8(d) on its head; rather than discouraging strikes through negotiation and mediation, it encourages strikes by removing the statutorily prescribed consequences of unlawful behavior. The Board's decision is contrary to law, inconsistent with its own precedent, and unsupported by substantial evidence.

Because we hold that the hiring hall registrants were "employee[s] who engaged in a strike" within the meaning of Section 8(d)–and thus lost the protection of Section 8 of the Act–we grant the Employers' petition for review and deny the Board's cross-application for enforcement. The Employers did not violate Sections 8(a)(1) & (3) by refusing to accept referrals from Local 39, nor did they violate Sections 8(a)(5) & (1) by withdrawing recognition from Local 39.

D.   Other issues

All other issues raised in the petitions for review are resolved by our main holding. Because the hiring hall registrants were lawfully terminated and lost the protection of the Act: (1) Freeman and GES did not violate Sections 8(a)(2) & (1) by entering into a collective bargaining agreement with the Carpenters; (2) the Carpenters did not violate Section 8(b)(1)(A) by acting as the representative of employees in the bargaining unit formerly represented by Local 39; (3) Zenith and Eagle did not violate Section 8(a)(5) by refusing to provide Local 39 with information relevant to its representation duties; and (4) GES did not violate Section 8(a)(1) by interrogating employees about their union activities. Thus, we grant the Employers' and Carpenters' petitions for review

in all respects and deny the Board's cross-application for enforcement. Finally, we lack jurisdiction to consider Local 39's petition for review claiming that the Board should have included 330 of its members in its remedial order. Not only does our principal holding render this issue moot, but Local 39 failed to raise the issue before the Board in a motion for reconsideration and thus may not raise it before this Court. *See* 29 U.S.C. § 160(e); *Alwin Mfg. Co. v. NLRB*, 192 F.3d 133, 143 (D.C. Cir. 1999).

### III.  Conclusion

For the foregoing reasons, we hold that Local 39's hiring hall registrants were "employee[s] who engage[d] in a strike" within the meaning of Section 8(d) of the Act, and thus lost the protection of the Act. Accordingly, we grant the Employers' and the Carpenters' petitions for review, deny the Board's cross-application for enforcement, and dismiss Local 39's petition for lack of jurisdiction.

*So ordered.*

TATEL, *Circuit Judge*, concurring in part and dissenting in part: I agree with the court's *Chevron* step one conclusion that Congress has not spoken to "the precise question at issue," *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984): How does section 8(d) of the National Labor Relations Act apply to hiring halls? But because the National Labor Relations Board's resolution of that question represents a reasonable interpretation of section 8(d), and because in rejecting that interpretation the court has substituted its views of labor policy for those of the Board, I dissent.

Section 8(d) states that "[a]ny employee who engages in a strike within any notice period specified in this section . . . shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of [the NLRA], . . . but such loss of status for such employee shall terminate if and when he is reemployed by such employer." 29 U.S.C. § 158(d). NLRA section 2(3) defines "employee" as "any employee," providing that the term "shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise." 29 U.S.C. § 152(3).

Reading section 8(d) as "explicitly stat[ing] otherwise," the Board interprets the section as applying only to "employee[s] of the employer engaged in the particular labor dispute," in this case hiring hall registrants actually on referral to an employer at the time of the strike, rather than to all "employees," a category the Supreme Court has held to include hiring hall registrants, *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667 (1961). *Freeman Decorating Co.*, 336 N.L.R.B. No. 1, 2001 NLRB LEXIS 798, at \*32–33 (Sept. 28, 2001). The court rejects this interpretation as unreasonable on two grounds: first, section 8(d)'s plain language, "[w]hen read in light of [its] structure and purpose, . . . is not an 'explicit' limitation of the term 'employee,'" Maj. Op. at 10, and second, the Board's interpretation produces results inconsistent with the basic purposes of section 8(d) and the NLRA, Maj. Op. at 11–12.

With respect to the first rationale, if the court believes that section 8(d)'s plain language, structure, and purpose require

that the section apply to all statutory "employees," then it seems to me the court should have rejected the Board's interpretation at *Chevron* step one. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (considering the Food, Drug, and Cosmetic Act's plain language, structure, and purpose in rejecting, at *Chevron* step one, the Food and Drug Administration's assertion of jurisdiction over tobacco products). But the court did not do so, and for good reason: Section 8(d) is far from unambiguous. Although the provision begins with the phrase "any employee," its later reference to loss of status as an "employee of the employer engaged in the particular labor dispute" suggests that it applies only to those who can lose such status, namely current "employees of the employer engaged in the particular labor dispute." In the ordinary case—for example, factory workers involved in an illegal strike—the question whether section 8(d) applies to "any employee" or only to "employees of the employer engaged in the particular labor dispute" makes no difference, since all illegal strikers are covered by both phrases. *See, e.g.*, *Marathon Elec. Mfg. Corp.*, 106 N.L.R.B. 1171 (1953), *enforced sub nom. United Elec., Radio & Mach. Workers of Am., Local 1113 v. NLRB*, 223 F.2d 338 (D.C. Cir. 1955) (applying section 8(d) to factory workers engaged in an illegal strike). In the hiring hall situation, in contrast, registrants can be "employees" but not "employees of the employer engaged in the particular labor dispute." Under these circumstances, it should come as no surprise that precisely how section 8(d) applies to hiring halls is far from clear, particularly since, as the parties agreed at oral argument, section 8(d)'s language and legislative history give no sign that Congress considered hiring halls when it enacted that section through the 1947 Taft–Hartley Amendments to the NLRA, Pub. L. No. 80–101, 61 Stat. 136. In fact, as late as 1957, the Board had held that hiring halls are illegal *per se* under the NLRA, *Mountain Pac. Chapter of the Associated Gen. Contractors, Inc.*, 119 N.L.R.B. 883 (1957), a conclusion not overruled by the Supreme Court until 1961—fourteen years after section 8(d)'s enactment, *Local 357*, 365 U.S. 667.

Had Congress considered hiring halls when it enacted section 8(d), it could have used language that unambiguously resolved the precise issue we face here. For instance, if Congress had wished for section 8(d) to apply to all hiring hall registrants, it would have provided that "[a]ny employee who engages in a strike . . . shall <u>not enjoy</u> ~~lose his~~ status as an employee ~~of the employer engaged in the particular labor dispute~~, for the purposes of sections 8, 9, and 10 of [the NLRA]." Or if, in addition to specifying that section 8(d) applies to all hiring hall registrants, Congress had wished to adopt this court's view—that illegal strikers do not "lose the Act's protection for all time or for all employers," Maj. Op. at 10—it would have provided that "[a]ny employee who engages in a strike . . . shall <u>not enjoy</u> ~~lose his~~ status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of [the NLRA]." Or if Congress had wished to adopt the Board's interpretation— that section 8(d) applies only to "employee[s] of the employer engaged in the particular labor dispute"—it would have provided that "[a]ny employee <u>of the employer engaged in the particular labor dispute</u> who engages in a strike . . . shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of [the NLRA]."

Because, as written, section 8(d) falls somewhere in between the second and third options, this court has no basis for concluding that the Board acted unreasonably in interpreting the statute's direct reference to "employee[s] of the employer engaged in the particular labor dispute" as constituting section 2(3)'s "explicit" limitation on the scope of "employee." This is especially true given that section 8(d)'s reference to "employee[s] of the employer engaged in the particular labor dispute" is one of only two instances in the entire NLRA where the term "employee" is restricted to employees of a "particular" anything. The other, section 8(b)(4)(i)(D), is hardly more "explicit." It states that "forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization

or in another trade, craft, or class" is an unfair labor practice. 29 U.S.C. § 158(b)(4)(i)(D).

The Board's interpretation of section 8(d) seems especially reasonable in light of the phrase following the section's loss-of-status provision: "such loss of status for such employee shall terminate if and when he is *reemployed by such employer*." 29 U.S.C. § 158(d) (emphasis added). The reference to *re*employment, like the earlier reference to *loss* of status, suggests that Congress did not intend section 8(d) to apply to employees having no past or current relationship with particular employers. Moreover, the return-of-status provision makes sense only under the Board's interpretation of section 8(d). Under that interpretation, just the three hiring hall registrants employed at the time of the strike lose their NLRA protection, and, pursuant to the return-of-status provision, those three would regain their protection if the Employers reemploy them at some future date. In contrast, under the court's interpretation, all hiring hall registrants lose their NLRA protection, but only those who once worked for a particular employer can regain it; those who never worked for a particular employer can never regain NLRA protection since they cannot be "*re*employed by *such* employer." It makes little sense to suppose Congress intended *remediable* loss-of-status for previous employees of the Employers but *perpetual* loss-of-status for all other hiring hall registrants. Why would Congress grant illegal strikers who once worked for a particular employer *greater* protection than illegal strikers who never did?

The court's second ground for rejecting the Board's interpretation as unreasonable is that applying section 8(d) only to hiring hall registrants on referral at the time of the strike undermines the section's purpose and "renders the [NLRA] internally inconsistent." Maj. Op. at 11. Specifically, the court points out that the Board's interpretation means "many unlawfully striking hiring hall workers will suffer no consequences from their unlawful behavior," and that "unions could easily exploit the statutory gap caused by the Board's interpretation by initiating an unlawful strike during a slow referral period and continuing to withhold labor throughout a busy

season." *Id*. at 11–12. Thus, the court concludes, "[t]he Board's reading upsets the statutory balance struck by Congress." *Id*. at 12.

While it is true that under the Board's interpretation "many unlawfully striking hiring hall workers will suffer no consequences from their unlawful behavior," the court ignores the fact that under its interpretation many workers with highly attenuated relationships with the hiring hall at the time of the strike—or even no relationship at all—will suffer serious consequences. Indeed, reading the court's opinion, one would never know that at the time of the strike approximately 300 of the workers terminated by the Employers were not even registered with Local 39 for work referrals. *Freeman Decorating Co.*, NLRB LEXIS 798, at *9. Nor would one know that of the 2,331 workers who were registered, only an unknown subset had ever worked for any of the Employers in the past. *Id.* at *31. Nor, finally, would one know that of the roughly 2,600 terminated workers, the record contains evidence that only 357 (a figure later revised downward to 330) "had engaged in picketing activity or otherwise supported the strike," *id.* at *50, and only 126 union members attended the meeting at which the union voted to strike, *id.* at *92 n.8. In fact, the record contains no evidence that the vast majority of the 2,600 terminated workers even knew that the union was on strike until they received the Employers' letter informing them of their termination.

Given these facts—that not all of the terminated workers were even registered with the hiring hall at the time of the strike, and that many of the remaining 2,331 terminated registrants had never worked for the Employers, were not working for them at the time of the strike, and, even without the strike, might never have worked for them in the future—the Board chose to interpret section 8(d)'s scope narrowly. The Board explained its policy choice as follows:

> [T]he issue is which individual workers will lose the protection of the [NLRA], by virtue of their employment relationship and their conduct. In concluding that the [NLRA's] loss-of-status provision applies

> only where individual workers can fairly be regarded as complicit in an unlawful strike, . . . . we believe that Congress could not have intended the draconian result that our [dissenting] colleague would permit in this case.

*Freeman Decorating*, NLRB LEXIS 798, at \*33.

Although the court thinks the Board acted unreasonably by failing to interpret section 8(d) as punishing every illegally striking worker, nothing in section 8(d)'s plain language suggests that the provision's purpose is meting out individualized punishments. Rather, as the court acknowledges, section 8(d)'s contract modification and termination provisions seem designed to establish a "system of notification and mediation," Maj. Op. at 12, including requiring unions to give thirty days' notice before striking. Restricting section 8(d)'s loss-of-status penalty to workers actually on referral at the time of a strike may indeed dull unions' incentive to give proper notice and invite strategic behavior, but it does not eliminate the incentive altogether. Even though the court may believe that weakening employers' protection against illegal strikes in order to protect innocent employees constitutes unwise labor policy, the purpose of the NLRA is not solely "to promote the full flow of commerce," but also "to prescribe the legitimate rights of both *employees* and employers." 29 U.S.C. § 141(b) (emphasis added). The Board can hardly be accused of unreasonably subverting the statute's overall purpose where, as here, it seeks to balance the competing interests of employers and employees.

The fundamental point is this: Only the Board, not this court, has authority to choose on policy grounds between two alternative interpretations of the NLRA, so long as neither interpretation departs from the statute's text or overall purpose. As the Supreme Court has observed, "[t]he ultimate problem" in federal labor law is "the balancing of [employees' and employers'] conflicting legitimate interests." *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96 (1957). "The function of striking that balance to effectuate national labor policy," the Court continued, "is often a difficult and

delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Id.* Because " '[c]ourts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy,' " *id.* at 96 n.28 (quoting *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941))—precisely what this court has done—I would sustain the Board's statutorily permissible, reasonable, policy-conscious interpretation of section 8(d).

Two final points. First, after raising the possibility that unions might "exploit the gap caused by the Board's interpretation" by timing illegal strikes to coincide with a "slow referral period," the court states that "[i]ndeed, that hypothetical is close to the facts of this case." Maj. Op. at 12. Nothing in the record supports this statement. In fact, Local 39's failure to file the proper notice with the Federal Mediation and Conciliation Service seems to have stemmed from a good faith mistake. As soon as Local 39 learned of its error, it "attempted to accept any contract offer that was still on the table." Maj. Op. at 4.

Second, although my view of section 8(d) makes it unnecessary to consider which of the alleged discriminatees "engage[d] in a strike," I question the court's conclusion that *all* the alleged discriminatees "engage[d] in a strike." *See* Maj. Op. at 12–15. Even if, as the court holds, the Board erred by refusing to accept the Employers' proffered evidence about the discriminatees' strike activities and by deciding as a legal matter that *none* of the alleged discriminatees engaged in a strike, the court should have remanded to the Board with instructions to consider the relevant evidence and to articulate criteria for determining whether hiring hall registrants engaged in a strike. *See Plumbers & Steamfitters Local 342 v. NLRB*, 598 F.2d 216, 222 (D.C. Cir. 1979) (remanding to Board because "[w]e think it inconsistent with Congress' general scheme for judicial review under the Act to address such complex and important questions of statutory interpretation without the benefit of the agency's expertise in the first instance"). Instead, the court announces a *per se* rule that

"all hiring hall registrants" should be deemed participants in any illegal strike declared by their hiring hall. Maj. Op at 15. Not only does this rule unnecessarily constrain the Board's ability to interpret section 8(d) in future hiring hall cases, but the court's application of the rule to this case ignores the fact that at the time of the strike roughly 300 discriminatees were not even "hiring hall registrants."

I concur with the court's conclusion that Local 39's arguments on appeal were not properly raised. Maj. Op. at 15–16.